[No. A098118. First Dist., Div. One. May 16, 2003.]

FRIENDS OF THE EEL RIVER et al., Plaintiffs and Appellants, v. SONOMA COUNTY WATER AGENCY, Defendant and Respondent; PACIFIC GAS AND ELECTRIC COMPANY, Real Party in Interest and Respondent.

860

COUNSEL

Law Offices of Stephan C. Volker, Stephan C. Volker and Eileen M. Rice for Plaintiffs and Appellants.

Steven M. Woodside, County Counsel, Jill D. Golis and Sheryl L. Bratton, Deputy County Counsel; Bartkiewicz, Kronick & Shanahan, and Alan B. Lilly for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

OPINION

MARGULIES, J.—

## I. INTRODUCTION

In this appeal, we determine the sufficiency of an environmental impact report (EIR) prepared by defendant and respondent Sonoma County Water Agency (Agency) for a project increasing the Agency's withdrawal of water from the Russian River. Appellants, Friends of the Eel River et al.,[1] contend the EIR does not comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; Cal. Code Regs., tit. 14, § 15000 et seq. (CEQA))[2] and violates certain planning laws. Appellants challenge the EIR on three primary grounds: (1) the EIR fails to adequately consider the project's impacts and alternatives; (2) the EIR does not describe the project's environmental setting accurately; and (3) the Agency did not comply with certain planning laws in its approval of the project. We conclude the EIR does not contain adequate cumulative impacts and alternatives analyses and its description of the project's environmental setting is deficient. We reject appellants' remaining arguments. Because the EIR is inadequate, the trial court erred in denying appellants' petition for a writ of mandate vacating the Agency's certification of the EIR and approval of the project. Accordingly, we reverse the judgment.

---

[1] In addition to Friends of the Eel River, this appeal is also brought by a number of other organizations, Friends of the Russian River, Pacific Coast Federation of Fishermen's Associations, California Sportfishing Protection Alliance, Wiyot Tribe of the Table Bluff Reservation, and three individuals, Coyote (Fred Downey, Ph.D.), L. Martin Griffin, M.D., and Frank Egger.

[2] California Code of Regulations, title 14, section 15000 et seq. is cited as the Guidelines. The Guidelines are binding on California public agencies. (Guidelines, § 15000; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).)

## II. Factual and Procedural Background

Two rivers are at the heart of this controversy. The Russian River, the immediate source of water for the Agency's 500,000 customers, runs south from its headwaters near Ukiah, and then west to Jenner, where it empties into the Pacific Ocean. The Eel River lies to the northeast of the Russian River. It flows west and then north through Mendocino and Humboldt Counties and empties into the Pacific Ocean near Eureka.

The Agency draws water from the Russian River and then releases it to its customers in Sonoma and Marin Counties.[3] The Agency has the right to divert up to 75,000 acre-feet of water a year (AFY) from the Russian River under permits issued to it by the State Water Resources Control Board. At the time the Agency proposed this project, it was using 55,000 AFY of its permitted water rights. The Agency has determined it must divert considerably more water than its current permit allows in order to meet the needs of the growing populations of Sonoma and Marin Counties. The project that is the subject of the challenged EIR is a proposal to increase the Agency's diversions of Russian River water from 75,000 AFY to 101,000 AFY and to expand its transmission system of pumps, tanks and pipelines in order to meet the projected demands of its customers (the Project).

Despite its distance from the Agency's customers, the Eel River is a crucial part of the Agency's Russian River water supply system. For decades, Pacific Gas and Electric Company (PG&E) has redirected a significant amount of water from the Eel River under a license issued by the Federal Energy Regulatory Commission (FERC).[4] This water—between 159,000 and 181,000 AFY—powers a PG&E hydroelectric project in Potter

---

[3] The removal of water from a river is called a "diversion." The Agency stores the water it diverts from the Russian River in two reservoirs: Lake Mendocino and Lake Sonoma. These reservoirs are located, as their names suggest, in Mendocino and Sonoma Counties. The Agency releases water from these reservoirs to meet customer needs for potable water and to fulfill what are called "instream flow" requirements. These requirements, set by the State Water Resources Control Board, obligate the Agency to release water from Lakes Mendocino and Sonoma back into the Russian River in order to keep the river at optimum levels for recreational and environmental purposes, particularly in the dry summer months when the river's levels drop.

[4] Under the Federal Power Act, 16 United States Code section 791a et seq., FERC "is the only regulatory body authorized to issue licenses for hydroelectric power projects." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 957 [91 Cal.Rptr.2d 66].) FERC has broad authority. It is empowered to "issue licenses for projects 'necessary or convenient . . . for the development, transmission, and utilization of power across, along, from, or in any of the streams . . . over which Congress has jurisdiction.' 16 U.S.C. § 797(e) (1982 ed.). Section 10(a) of the Act also authorizes FERC to issue licenses subject to the conditions that FERC deems best suited for power development and other

Valley called the Potter Valley Project (PVP). After the water is used to generate power, it is sent into the Russian River, pursuant to a 1965 agreement between PG&E and the Agency[5] and PG&E's FERC license. As the Agency acknowledges in its EIR, "the PVP is important to the successful operation of the . . . Agency's water transmission system." In fact, *most* of the summer water flow in the Russian River consists of water diverted from the Eel River.

This diversion of water from the Eel River to the Russian River has resulted in a decline in the population of salmonid species in the Eel River and impacted fishery operations along the river. Several endangered species are among the fish populations that have been harmed by the diversion of water from the Eel River.

The environmental consequences of diverting water from the Eel River have not gone unnoticed. In 1983, as a condition of relicensing PG&E's Potter Valley Project, FERC ordered PG&E, in cooperation with the California Department of Fish and Game and the United States Fish and Wildlife Service, to carry out fish monitoring studies at the Potter Valley Project for a decade, between 1985 and 1995. (*Covelo Indian Community v. F.E.R.C.* (9th Cir. 1990) 895 F.2d 581.) In 1998, PG&E, joined by these two wildlife agencies and the National Marine Fisheries Service, filed a proposal to decrease by 22 percent the amount of water diverted from the Eel River to the Russian River (the Consensus Recommendation).[6]

The Agency participated in the FERC proceeding and vigorously opposed the Consensus Recommendation. It put forward an alternate proposal for curtailing diversions from the Eel River by 10 percent by the year 2022. In so doing, the Agency pointed out that cutting off Eel River water to the

public uses of the waters. 16 U.S.C. § 803(a) (1982 ed.). Congress' subsequent amendments to those provisions expressly direct that FERC consider a project's effect on fish and wildlife as well as 'power and development purposes.' Electric Consumers Protection Act of 1986, Pub.L. 99-495, 100 Stat. 1243, 16 U.S.C. §§ 797(e), 803(a)(1)." (*California v. FERC* (1990) 495 U.S. 490, 494 [110 S.Ct. 2024, 2027, 109 L.Ed.2d 474].)

[5]The contract provides: "Pacific agrees to operate said facilities [the PVP] so as to perpetuate the long-continued diversion of water from the Eel River to the aforementioned tributary of the East Fork of the Russian River." This agreement need not be complied with under four circumstances: When to do so would (1) interfere with or increase the cost of PG&E's normal operation of the PVP; (2) threaten to reduce PG&E's supply of stored water below minimum safe reserves needed to generate power at the PVP; (3) result in a violation of PG&E's license to operate the plant; and (4) result in diversions of water through the PVP which are not sanctioned by the rights held by PG&E or the Agency under law.

[6]The Round Valley Indian Tribes also filed a proposal to reduce diversions from the Eel River. The record does not contain specific information about this proposal, except that it too involves a decrease in the amount of water diverted from the Eel River.

extent proposed in the Consensus Recommendation would have severe environmental consequences to the Russian River, including the risk of dewatering portions of that river during critically dry years because of the impossibility of maintaining "prudent water storage reserves." Despite these concerns, the Agency did not include in this EIR, which contemplated an increase in water withdrawn from the Russian River, any discussion of the potential curtailments in Eel River diversions. Instead, the Agency made only a summary reference to the pending FERC proceedings.

Appellants argued, both in administrative hearings and before the trial court, that the Agency was required to consider the environmental consequences of the proposals before FERC to curtail water diverted from the Eel River into the Russian River. Appellants also contended the Agency was required to disclose and discuss the long-standing diversion of water from the Eel River and the fact that these diversions have ongoing environmental consequences to the Eel River, most notably seen in the loss of endangered salmonid species. In a similar vein, appellants argued that the Project's commitment of water from the Russian River to customer uses would make FERC reluctant to curtail the diversion of Eel River water. Appellants contended the Agency was required to disclose this possibility in the EIR.

The Agency rejected appellants' arguments and approved the EIR without making the analyses and disclosures urged by appellants. Appellants challenged this approval in the Sonoma County Superior Court on the grounds that the EIR was insufficient under CEQA and the Agency's approval of the EIR violated California planning law. The Agency defended its failure to discuss the possible curtailment of Eel River diversions by characterizing the proposed curtailments as speculative. The trial court rejected appellants' challenge to the EIR. This timely appeal followed.

## III. Discussion

### A. *Standard of Review*

In *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 356-357 [110 Cal.Rptr.2d 579] (*Napa Citizens*), we articulated the standard of review applicable to a CEQA challenge. " '[I]n reviewing agency actions under CEQA, Public Resources Code section 21168.5 provides that a court's inquiry "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." ' " (*Napa Citizens*, at pp. 356-357.) "On appeal, '[i]n applying the substantial

evidence standard, "the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision." ' (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 393.) The role of the appellate court . . . is precisely the same as the trial court's, and the lower court's findings are not conclusive on appeal. [Citation.]" (*Napa Citizens,* at p. 357.)

"Thus, the reviewing court ' "does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." ' [Citations.] We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. 'Our limited function is consistent with the principle that "[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' [Citations.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].) With these principles in mind, we consider appellants' CEQA arguments.

B. *Cumulative Impacts Analysis*

■ Appellants argue the EIR's cumulative impacts analysis is flawed because it does not take into account the proposals pending before FERC to curtail water diverted from the Eel River into the Russian River. The Agency, on the other hand, argues the outcome of the FERC proceeding is speculative and need not be included in the cumulative impacts discussion of the EIR. We conclude it was reasonable and practical to include a discussion of the FERC proceeding in the EIR, and the Agency failed to proceed in a manner required by law when it concluded otherwise. The Agency, therefore, abused its discretion in certifying the EIR. (*Laurel Heights, supra,* 47 Cal.3d at p. 376; San Franciscans for Reasonable Growth v. City and County of San Francisco (1984) 151 Cal.App.3d 61, 71 [198 Cal.Rptr. 634] (*San Franciscans for Reasonable Growth*).)

The Guidelines require the Agency to consider "past, present, and probable future projects producing related or cumulative impacts . . . ." (Guidelines, § 15130, subd. (b)(1)(A).) The Agency must interpret this requirement in such a way as to "afford the fullest possible protection of the environment." (*Citizens Assn. for Sensible Development of Bishop Area v. County of*

*Inyo* (1985) 172 Cal.App.3d 151, 168 [217 Cal.Rptr. 893]; see also *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049]; *San Franciscans for Reasonable Growth, supra,* 151 Cal.App.3d 61, 74.)

In *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 723 [270 Cal.Rptr. 650] (*Kings County Farm Bureau*), the court held that, in considering whether an EIR must include related projects, "[t]he primary determination is whether it was reasonable and practical to include the projects and whether, without their inclusion, the severity and significance of the cumulative impacts were reflected adequately." Here, the answer to this inquiry leads to the conclusion that the FERC proceeding was a related project and should have been included in the EIR.

We disagree with the Agency's contention that the FERC proceeding is inconclusive and need not be analyzed in the EIR's cumulative impacts section. Certainly, the present EIR might lead to this conclusion. In that document, according to the Agency, "PG&E, in consultation with the resource agencies, was required to file with FERC recommendations for *modifications* to the required flow schedule, operations, or structures for the purpose of protecting and maintaining fisheries resources in the Eel and East Fork Russian rivers. A consensus recommendation, in which the National Marine Fisheries Service (NMFS) also joined, was filed with FERC by PG&E at the end of March 1998." (Italics added.)

The record tells a far different story from the one the Agency relates in its EIR. Although the Agency euphemistically describes the flow proposals before FERC as "modifications," *every* proposal before FERC—including the Agency's own—posits a *decrease* in the amount of water available to the Agency to supply its customers' needs at a time when the Agency is seeking to *increase* the amount of water it takes out of the Russian River.

Moreover, the Agency was well aware at the time the EIR was drafted that the proposals pending before FERC, if approved, would limit its ability to supply water to its customers in an environmentally sound way under current conditions. In a letter sent to FERC about a month before the EIR was certified, the Agency told FERC that the Consensus Recommendation proposed by PG&E and a number of federal and state wildlife agencies would lead to a "dramatic increase in the risk that Lake Mendocino, and the Russian River between Coyote Valley Dam and Healdsburg, would be dewatered in a critically dry year by failure to maintain prudent water storage reserves. The economic and environmental consequences of such

dewatering would be enormous. The National Marine Fisheries Service has listed steelhead trout and coho salmon in the Russian River as threatened species under the Endangered Species Act ('ESA'). In addition to the obvious impacts on endangered fish of dewatering the upper Russian River, lower Lake Mendocino water levels would often result in higher water temperatures that could adversely affect the salmonid rearing habitat maintained for several miles downstream of Coyote Valley Dam by cold water releases from Lake Mendocino. Salmonid rearing habitat on Dry Creek also could be adversely affected by warmer releases from Lake Sonoma resulting from reduced diversions to the Russian River." Although the Agency was aware of the nature of the proposals pending before FERC and the environmental consequences of these proposals, its EIR completely fails to alert the public and the decision makers to the cumulative impact of Eel River curtailments pending before FERC and increased Russian River diversions proposed in the Project.

CEQA requires more than this. Despite the Agency's argument to the contrary, it was both reasonable and practical to include the Eel River curtailment proposals pending before FERC in the Agency's cumulative impacts analysis. At the time the EIR was prepared, the proposals before FERC had progressed to the point that an environmental impact statement, the federal equivalent of an EIR (Guidelines, § 15363), had been initiated. Based on this fact alone, we can conclude the possible curtailment of Eel River diversions was a reasonably foreseeable future project, which should have been included in the EIR's discussion of cumulative impacts. For example, in *San Franciscans for Reasonable Growth, supra,* 151 Cal.App.3d 61, 75, the court held that high-rise building projects that had progressed far enough to be under environmental review must be considered in a cumulative impacts analysis because "experience and common sense indicate that projects which are under review are 'reasonabl[y] foreseeable probable future projects.' "

The Agency responds that FERC has been considering some curtailment of Eel River diversions for a long time and has yet to take action. We do not agree that a lengthy review process means a project is speculative. We doubt the Agency would describe its own project as speculative, despite the fact that a great deal of time has elapsed since the project was originally proposed. Similarly, the proposals pending before FERC to decrease Eel River diversions may not be considered speculative simply because the FERC process appears to be a lengthy one.

Another basis for our conclusion that the FERC proceeding should have been included as a related project in the cumulative impacts section of the

Agency's EIR is the fact that the Agency has been participating actively in this proceeding.[7] In *Kings County Farm Bureau, supra,* 221 Cal.App.3d 692, 723, evidence that environmental information omitted by the agency was, in fact, available for inclusion in the EIR, led the court to conclude that "the EIR could reasonably and practically have included such projects in its analysis." The Agency's detailed submittal to FERC on November 6, 1998 (a month before the EIR was certified) leaves little doubt that the Agency, an active and sophisticated participant in the FERC licensing procedure, had more than sufficient information with which to analyze the FERC proceeding in its EIR.

Finally, the Agency's failure to consider the impact of the potential curtailment of water from the Eel River has resulted in an EIR that fails to alert decision makers and the public to the possibility that the Agency will not be able to supply water to its customers in an environmentally sound way. (*Kings County Farm Bureau, supra,* 221 Cal.App.3d at p. 724.) Throughout the EIR, the Agency relies on a tool referred to as the "Russian River Model." The model is used by the Agency to simulate demand on its Russian River water supply system in order to determine whether there is adequate water to meet customer demands. In the cumulative impacts section, the Agency forecasts demands on its water supply system and then, using the model, draws conclusions about whether its existing water supplies will meet these future demands. One assumption the Agency relies on in determining whether there is enough water to meet future demands is that the Russian River will continue to receive diversions from the Eel River.

The EIR concludes that existing supplies can meet future demands for water, and that minimum stream flow requirements imposed by the State Water Resources Control Board can also be maintained even when future water demands are taken into account. This is not an insignificant conclusion environmentally, because these minimum stream flow requirements are designed in part to ensure the health of species in the river. And yet, had the Agency taken into account the potential curtailment of Eel River diversions, it might well have reached a different conclusion about whether existing

---

[7]The Agency is not a newcomer to FERC's licensing of the PVP. In *Covelo Indian Community v. F.E.R.C., supra,* 895 F.2d 581, 583, the court noted that, in 1970 when PG&E filed an application with FERC to renew its license to operate the PVP, Sonoma County was granted intervener status because of its concern "about the allocation of water between the Eel and Russian Rivers . . . ." In these most recent FERC proceedings, PG&E filed its Consensus Recommendation in March 1998. In May 1998, the Round Valley Indian Tribes filed a different proposal. The Agency filed its objections to these proposals in June 1998 and made alternate proposals in August 1998. All of this activity occurred before the EIR in this case was final.

water supplies could satisfy customer demands *and* minimum stream flow requirements.

The Agency has made clear it believes that the Consensus Recommendation pending before FERC will have "enormous" environmental consequences. The failure to consider these consequences has resulted in an underestimation of the Agency's ability to meet customer demands without negative environmental consequences. (*Kings County Farm Bureau, supra,* 221 Cal.App.3d at p. 724.)

In conclusion, this EIR should have, but did not, consider whether the proposed curtailments in Eel River diversions would lead to significant cumulative impacts in combination with the Project. The absence of this analysis makes the EIR an inadequate informational document. ██ " '[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA.' [Citation.] The error is prejudicial 'if the failure to include relevant information precludes informed decision making and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 721-722 [32 Cal.Rptr.2d 704] (*San Joaquin Raptor*).) ██ The public and the decision makers should have been made aware that the proposed curtailment of Eel River diversions might impact the Agency's ability to provide water to its customers in an environmentally sound way. The Agency's failure to do so renders this EIR deficient.

## C. *Alternatives Analysis*

Appellants contend the EIR's alternatives analysis is flawed. Appellants assert the EIR should have, but did not, consider alternatives that would reduce its dependence on water diverted from the Eel River, particularly in light of the proposals before FERC to curtail this water. ██ ██ ██ We agree.[8]

██ An EIR is required to "ensure that all reasonable alternatives to proposed projects are thoroughly assessed by the responsible official."

[8]The Agency suggests that appellants did not raise this issue during the administrative proceedings and, therefore, have failed to exhaust their administrative remedies. We disagree. In comments to the Agency, numerous persons requested that the Agency more thoroughly review conservation alternatives. These comments sufficiently preserved the issue for review. (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo, supra,* 172 Cal.App.3d 151, 162-163.)

(*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 197 [132 Cal.Rptr. 377, 553 P.2d 537].) Therefore, "[a]n EIR must '[d]escribe a range of reasonable alternatives to the project or to the location of the project, which could feasibly attain the basic objectives of the project and evaluate the comparative merits of the alternatives.' (Guidelines, § 15126, subd. (d).) The discussion must 'focus on alternatives capable of eliminating any significant adverse environmental effects or reducing them to a level of insignificance, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly.' (Guidelines, § 15126, subd. (d)(3).)" (*Kings County Farm Bureau, supra,* 221 Cal.App.3d at p. 733.) This discussion of alternatives must be "meaningful" and must "contain analysis sufficient to allow informed decision making." (*Laurel Heights, supra,* 47 Cal.3d 376, 403-404.)

The Agency was required to consider project alternatives that might eliminate or reduce the Project's significant adverse environmental effects. The EIR presently considers alternatives fashioned by the Agency in light of the EIR's flawed cumulative impacts analysis. In *San Joaquin Raptor, supra,* 27 Cal.App.4th 713, 738, the court held that, where the EIR's description of the project's environmental setting was not "accurately and fully assessed," the alternatives analysis was also flawed. In finding the alternatives analysis flawed, the court pointed out that the EIR's "discussion of alternatives does not foster 'informed decision making' [citation]" because it is "devoid of substantive factual information from which one could reach an intelligent decision as to the environmental consequences and relative merits of the available alternatives to the proposed project. . . . [Citation.]" (*Ibid.*) Here, as there, "[b]ecause the discussion of alternatives omitted relevant, crucial information, it subverted the purposes of CEQA and is legally inadequate." (*Id.* at pp. 738-739.)

The Agency must discuss project alternatives that would mitigate any significant cumulative impact of the proposed curtailment of Eel River diversions and the Agency's Project. Alternatives that would reduce the Agency's reliance on water diverted from the Eel River would be among the alternatives that must be considered by the Agency in the event it determines that the cumulative impact of the Project and the FERC proceeding is significant.

D. *The Project's Environmental Setting*

Appellants contend the EIR's description of the Project's environmental setting is deficient. Appellants argue that under CEQA, the Agency was

required to reveal that Eel River diversions, on which the Agency depends for a significant amount of water, have harmed salmonid species in the Eel River. The Agency on the other hand, contends its abbreviated description of historical levels of diversions from the Eel River sufficiently describes the Project's environmental setting. We conclude the EIR's description of the Project's environmental setting is deficient because it does not disclose either the impact on Eel River salmonid species of diverting water from the Eel River or the fact that FERC is considering proposals to curtail these diversions in order to prevent harm to these species.

An EIR must contain an accurate description of the project's environmental setting. An EIR "must include a description of the physical environmental conditions in the vicinity of the project . . . from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (Guidelines, § 15125, subd. (a).) There is good reason for this requirement: "Knowledge of the regional setting is critical to the assessment of environmental impacts. . . . The EIR must demonstrate that the significant environmental impacts of the proposed project were adequately investigated and discussed and it must permit the significant effects of the project to be considered in the full environmental context." (Guidelines, § 15125, subd. (c).) We interpret this Guideline broadly in order to "afford the fullest possible protection to the environment." (*Kings County Farm Bureau, supra,* 221 Cal.App.3d 692, 720.) In so doing, we ensure that the EIR's analysis of significant effects, which is generated from this description of the environmental context, is as accurate as possible. (See also Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (10th ed. 1999) pp. 374-376.)

In the chapter devoted to the Project's environmental setting, the EIR largely focuses on Lake Sonoma, the southernmost reservoir in the Agency's water supply system, and the reservoir from which the Agency will make the proposed increased withdrawals of water. In so doing, the EIR omits a meaningful discussion of the conditions in the northern part of the water supply system: Most notably, the diversion of Eel River water to the Russian River, the impact these diversions have had on salmonid species in the Eel River, and the proposals pending before FERC to curtail Eel River diversions in order to protect these species. Beyond stating that most of the stream flow in the Russian River during the summer months comes from water "imported" from the Eel River, the Agency fails to alert the public and the decision makers to the real possibility that these diversions, on which the Agency depends, will be curtailed.

As we have explained, FERC, which authorizes these diversions, has received proposals to *decrease* the amount of water diverted from the Eel

River. The EIR's incomplete description of the Project's environmental setting fails to set the stage for a discussion of the cumulative impact of the FERC proceeding and the Project. We conclude the EIR must disclose to the public and decision makers that, because of the harm caused by Eel River diversions to salmonid species in that river, proposals are pending before FERC to curtail these diversions, on which the Agency depends. Without this information, the EIR does not comply with Guidelines section 15125. (*San Joaquin Raptor, supra,* 27 Cal.App.4th 713, 722-729; see also *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1122 [71 Cal.Rptr.2d 1].)

E. *The Project's Impacts on the Eel River*

■ Although we conclude the EIR must discuss the fact that the diversion of Eel River water has harmed salmonid species in that river, we do not agree that this harm is a significant impact caused by *this* Project, as appellants argue. Nor do we agree with appellants' argument that another significant impact of the Project is the possibility that, by committing additional Russian River water to Agency customers, the Agency will cause FERC to reject the pending proposals to curtail Eel River diversions.

In general, an EIR is required to identify and focus on direct and indirect environmental impacts caused by a project. Significant impacts typically involve changes in the existing environment caused by a project. (Guidelines, § 15126.2, subd. (a).) The Agency's Project, neither approves nor makes any change to Eel River diversions. Accordingly, it does not cause the conditions in the Eel River. These conditions, which predate the Project, would exist even if the Project was not approved. The record makes clear that the diversion of Eel River water is authorized by FERC through a license that gives PG&E the right to divert water from the Eel River. PG&E's diversion of this water into the Russian River takes place under a contract between the Agency and PG&E entered into in 1965. Under its terms, PG&E directs water from the Eel River into the Russian River and, in exchange, the Agency maintains dams and other structures associated with the PVP.

Both the FERC licensing procedure and the contract between the Agency and PG&E may well be "projects" under CEQA.[9] (See Guidelines, § 15378, subd. (a) [a project is the "whole of an action which has a potential for

---

[9]Ongoing projects, approved before November 23, 1970 (which would appear to include the PG&E contract), are statutorily exempt from CEQA unless "[a] public agency proposes to modify the project in such a way that the project might have a new significant effect on the

resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment"].) Quite clearly, neither the FERC proceeding nor the 1965 contract is the subject of the EIR challenged by appellants. Both the FERC proceeding and the 1965 contract may have significant environmental impacts, but nothing in the record indicates these impacts are caused by the Agency's Project.

In reality, appellants seem to be arguing that, although the Project does not authorize or change the diversion of Eel River water, the Agency must nevertheless account for the consequences of this diversion in its EIR for the Project simply because the Agency relies on these diversions. Appellants have not cited any authority for the proposition that, when a project relies on an arrangement that predates the project and is authorized in a different proceeding, the project's EIR must consider the significant impacts of this prior arrangement.

One case cited by appellants in support of this argument is *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795 [108 Cal.Rptr. 377]. *County of Inyo* involves the withdrawal of water from the Owens Valley to supply residents of the Los Angeles Basin. The project in *County of Inyo* was a proposal by the City of Los Angeles to expand and accelerate its extraction of subsurface water from Owens Valley. (*Id.* at p. 799.) The city argued it was not required to prepare an EIR for this proposal because it was not a new project. The court disagreed and held that the "City's expanded tapping and extraction of the underground water is an 'ongoing project,' requiring an EIR . . . ." (*Id.* at p. 808.) *County of Inyo* holds that, when a project proposes an increase in the scope of an existing project, an EIR must be prepared. Here, however, the Agency's Project does not involve any increase in or change to Eel River diversions. *County of Inyo* is, therefore, not helpful to appellants. *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818 [173 Cal.Rptr. 602] is similarly inapposite. The *Santiago County* court found that an EIR for a sand and gravel mine was deficient because it failed to analyze the increased demands for water that would result from the construction of the mine. (*Id.* at p. 831.) Because there is no evidence the Agency's Project will result in any increase in diversions from the Eel River, *Santiago County* is inapplicable.

We turn next to the issue of whether the EIR must consider the impact of the Agency's approval of the Project on the FERC proceedings. An EIR must discuss a project's direct and indirect significant impacts, but these

environment." (Guidelines, § 15261, subd. (a)(2).) The Agency has proposed no such modification to its contract with PG&E in this EIR.

impacts need be discussed only if they are likely to result from the project. (Guidelines, § 15126.2.) There is no requirement that an EIR analyze speculative impacts. Guidelines section 15145 provides, "If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact."

Appellants suggest that, if the Project is approved, the Agency will somehow lock in Eel River diversions and thus will make it impossible for FERC to curtail these diversions. The Agency points out that appellants' argument is based on an assumption that FERC will respond to the Project's approval by refusing to curtail Eel River diversions. Appellants have cited no evidence that the Agency's approval of the Project is a legally cognizable factor in FERC's decision to curtail Eel River diversions. The Agency, therefore, properly concluded it need not consider the impact of approving the Project on the FERC proceedings.

F. *Growth-inducing Impacts*

■ The Project is designed to accommodate the projected population growth of the eight cities and counties served by the Agency, as that growth is forecast under the general plans for these cities and counties. Between 1987 and 1995, EIR's were prepared for each of these general plans. In considering the growth inducing impacts of the Project, the Agency incorporates the discussion contained in these general plan EIR's. Appellants now contend the Agency's EIR is deficient because the Agency was required to prepare its own analysis of the consequences of growth in these eight cities and counties. The Agency argues that its reliance on these general plans is permitted under Guidelines section 15130, subdivision (b)(1)(B), which provides that a cumulative impacts analysis can rely on a "summary of projections contained in an adopted general plan or related planning document, or in a prior environmental document which has been adopted or certified, which described or evaluated regional or areawide conditions contributing to the cumulative impact." We agree.

Appellants suggest for the first time in their reply brief that the EIR's relied on by the Agency are deficient because these documents do not address the cumulative impacts of regional growth. Appellants support this contention with a blanket reference to seven volumes of the administrative record, the functional equivalent of offering no support whatsoever for this proposition. A " '. . . reviewing court is not required to make an independent, unassisted study of the record in search of error . . . .' " (*Guthrie v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [75 Cal.Rptr.2d 27])

and may treat an issue as waived "when an appellant makes a general assertion, unsupported by specific argument . . . ." (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].) Because we are not required to comb through the nearly 7,000 pages of the record cited by appellants in order to locate these claimed deficiencies, we treat this argument as having been waived by appellants.

## G. *Responses to Comments*

■ Appellants also contend the Agency failed to or did not adequately respond to a number of comments regarding various aspects of the EIR. Two of these comments raise issues we have identified as inadequately addressed by the Agency in the EIR and, therefore, these comments must be addressed in a revised EIR. Specifically, comment 1-9 requests additional evaluation of potential decreases in PVP diversions from the Eel River. Because we have held the Agency must take into account the pending proposals to curtail Eel River diversions, a revised EIR must address this request. Comment 45-3 requests that the EIR include a figure depicting the Eel River, a request the Agency must fulfill when it revises the description of the Project's environmental setting.[10]

We have reviewed the Agency's responses to the remaining comments and conclude they are adequate. "Guideline, section 15088, subdivision (b), explains that what is required of the responses is 'good faith, reasoned analysis. . . . Conclusory statements unsupported by factual information will not suffice.' " (*Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 683 [246 Cal.Rptr. 317].) " 'The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' . . . Thus, a lead agency need not respond to each comment made during the review process, however, it must specifically respond to the most significant environmental questions presented. [Citation.] Further, the determination of the sufficiency of the agency's responses to comments on the draft EIR turns upon the detail required in the responses. [Citation.] Where a general comment is made, a general response is sufficient. [Citation.]" (*Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 862 [226 Cal.Rptr. 575], italics omitted.) With these principles in mind, we will address briefly the remaining comments and responses challenged by appellants.

Comment 226-1 expresses a general concern that the Project will degrade natural habitats, reduce water for agricultural uses, and impact the health and

---

[10]This comment also requests the Agency evaluate, as a significant impact, the Project's impacts on the Eel River. As we earlier concluded, this analysis is not required under CEQA.

safety of drinking water. The Agency responded that the project would not have impacts on the Eel River and that its objective is to "provide a safe, economical, and reliable water supply . . . ." The response also referred to a more extensive discussion of agricultural water use contained elsewhere in the EIR. Given the lack of specificity contained in this comment, the Agency's response is adequate.

Comments 226-2 and 226-4 request that the Agency prepare a watershed management plan. We agree with the Agency that this comment asks the Agency to consider a different project and thus fails to raise any significant issues regarding the Project itself. The Agency's response, that a watershed management plan is not part of the Project, along with a reference to the section of the EIR discussing the Agency's watershed management activities, is adequate.

Comment 44-6 raises the issue of why the Agency had not developed programs to identify the habitat needs of steelhead trout, coho salmon, and chinook salmon. The Agency's response refers to its discussion of the listing of these species under the Endangered Species Act. We agree with the Agency that this comment does not point out any deficiencies in the Agency's analysis of the Project's impacts on these species in the EIR and, therefore, the Agency's response is adequate.

## H. California Planning Law Requirements

Appellants argue the Agency has failed to comply with certain planning law requirements. Appellants contend the Agency is in violation of Government Code sections 53091, 65401 and 65402 because it did not consider whether its Project is in compliance with the general plans of Marin, Mendocino, and Humboldt Counties. This argument is based on a misreading of the requirements of these Government Code sections and we reject it.

Government Code section 53091 provides that "[e]ach local agency shall comply with all applicable building ordinances and zoning ordinances of the county or city in which the territory of the local agency is situated." Appellants read this as a requirement that the Project comply with the general plans of Marin, Mendocino, and Humboldt Counties because the Agency's water transmission system operates in all of these counties. We disagree. This statute does not mandate compliance with applicable general plans at all. Rather, it contemplates compliance with building and zoning ordinances.

Neither of the cases cited by appellants convinces us otherwise. In *City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1009

[20 Cal.Rptr.2d 658], the East Bay Municipal Utility District proposed to expand and improve facilities at a filter plant that treated raw water for delivery to the district's customers. The district applied for a use permit for the project from the City of Lafayette, where the project was located. After the city denied the application, the district attempted to declare itself exempt from compliance with Lafayette's zoning and building ordinances. (*Id.* at p. 1012.) The issue in *City of Lafayette* is whether the district's project was exempt from these ordinances. Although appellants assert this case stands for the proposition that the district was required to comply with the City of Lafayette's general plan, this issue is simply never discussed. In *Lawler v. City of Redding* (1992) 7 Cal.App.4th 778 [9 Cal.Rptr.2d 392], the court held that the City of Redding was categorically exempt from compliance with the county's general plan under Government Code sections 53090 and 53091. It did not, therefore, address the specific question of whether section 53091 requires that an Agency's project comply with a county general plan. Our reading of this statute's plain language leads to the conclusion that it does not concern general plan compliance, a subject covered in Government Code sections 65401 and 65402.

Appellants further contend that, under Government Code section 65401, the Agency was required to submit its Project to the county planning agencies of all counties in which its water transmission system is located for review and report as to their conformity with these counties' general plans. The Agency counters that it was only required to do so in Sonoma County. We agree.

Government Code section 65401 provides, "If a general plan or part thereof has been adopted, within such time as may be fixed by the legislative body, each county or city officer, department, board, or commission, and each governmental body, commission, or board, including the governing body of any special district or school district, whose jurisdiction lies wholly or partially within the county or city, whose functions include recommending, preparing plans for, or constructing, major public works, shall submit to the official agency, as designated by the respective county board of supervisors or city council, a list of the proposed public works recommended for planning, initiation or construction during the ensuing fiscal year. The official agency receiving the list of proposed public works shall list and classify all such recommendations and shall prepare a coordinated program of proposed public works for the ensuing fiscal year. Such coordinated program shall be submitted to the county or city planning agency for review and report to said official agency as to conformity with the adopted general plan or part thereof." Section 65402, subdivision (c) provides that local

agencies shall not construct or authorize a public structure in any county until the project has been submitted to and reported upon by the planning agency having jurisdiction over the project as to conformity with the local general plan.

We read these statutes as requiring the Agency to submit the Project, which involves the construction of additional facilities only in Sonoma County, to the Sonoma County Planning Commission. Although appellants suggest that the Project "evolves [sic] the construction and maintenance of check dams and other structures associated with the PVP in Mendocino County," in fact these facilities have already been constructed and are not subject to review under Government Code section 65402, subdivision (c).

Appellants acknowledge the Agency did submit the Project to the Sonoma County Planning Commission, as it was required to do. Nevertheless, appellants contend the EIR is deficient because the Project is in direct conflict with the Sonoma County general plan and this conflict is not disclosed in the EIR. An EIR is required to "discuss any inconsistencies between the proposed project and applicable general plans . . . ." (Guidelines, § 15125, subd. (d).) Thus, to the extent the Project is inconsistent with general plan goals such as the protection of rare and endangered species and stream environments, the EIR must discuss this inconsistency. When the Agency drafts a subsequent EIR to correct the deficiencies identified in this opinion, it may identify inconsistencies between the Project and the Sonoma County general plan, including those provisions that identify a policy to protect and restore fish and wildlife resources. At this point, however, we are unable to conclude the Project conflicts with the Sonoma County general plan.

I. *Conclusion*

We have concluded, based on the foregoing analysis of CEQA, that the EIR prepared by the Agency is an inadequate informational document. The EIR fails to adequately discuss the cumulative impact of the Project and the proposal pending before FERC to curtail Eel River diversions. To the extent the adequate analysis of Project alternatives depends on the EIR's thorough consideration of the Project's cumulative impacts, the EIR's alternatives analysis is also deficient. Further, the EIR fails to provide an accurate description of the Project's environmental setting. The EIR must disclose that diversions from the Eel River have impacted salmonid species in that river and given rise to proposals pending before FERC to curtail Eel River diversions. Finally, we conclude the Agency's responses to comments violate CEQA insofar as these comments raise issues we have identified as inadequately addressed in the EIR.

"When the informational requirements of CEQA are not complied with, an agency has failed to proceed in 'a manner required by law' and has therefore abused its discretion. [Citations.] [¶] . . . While we may not substitute our judgment for that of the decision makers, we must ensure strict compliance with the procedures and mandates of the statute. [Citations.]" (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118 [104 Cal.Rptr.2d 326].) The Agency's deficient EIR has made meaningful assessment of the potentially significant impacts of its Project impossible. Therefore, the Agency's failure to proceed as required by law was prejudicial and the trial court erred in denying appellants' petition for a writ of mandate vacating certification of the EIR and approval of the Project.[11] (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236-1237 [32 Cal.Rptr.2d 19, 876 P.2d 505]; *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 174 [258 Cal.Rptr. 147]; *Rural Landowners Assn. v. City Council* (1983) 143 Cal.App.3d 1013, 1023 [192 Cal.Rptr. 325].) The trial court erred in denying appellants' petition for a writ of mandate.

## IV. DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to grant appellants' petition for a writ of mandate vacating the Agency's certification of the EIR and approval of the Project. Appellants are awarded costs on appeal.

Marchiano, P. J., concurred.

**SWAGER, J.,** Concurring and Dissenting.—The majority opinion concludes that the description of the Potter Valley Project's (Project) environmental setting is deficient "because it does not disclose either the impact on Eel River salmonid species of diverting water from the Eel River or the fact that FERC is considering proposals to curtail these diversions in order to prevent harm to these species." (Maj. opn., *ante*, at p. 874.) Despite this conclusion, the majority holds that the harm caused to the salmonid species in the Eel River is not a "significant impact caused by *this* Project . . . ." (Maj. opn., *ante*, at p. 875.) I respectfully dissent from this portion of the opinion.

"Before the impacts of a project can be assessed and mitigation measures considered, an EIR must describe the existing environment. It is only against

---

[11]In light of this conclusion, we need not address appellants' argument that the Agency was required to recirculate or prepare a subsequent or supplemental EIR when it received information, after the draft EIR was circulated, that steelhead trout and coho and Chinook salmon had been listed as threatened species under the federal Endangered Species Act.

this baseline that any significant environmental effects can be determined. ([Cal. Code Regs., tit. 14], §§ 15125, 15126.2, subd. (a).)" (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952 [91 Cal.Rptr.2d 66].) The majority recognizes that an adequate description of the Project's environmental setting is necessary to insure that the EIR's (environmental impact report) analysis of significant impacts "is as accurate as possible" and notes two major deficiencies. (Maj. opn., *ante*, at p. 874.) The existing description veils the Project's dependence on maintaining existing Eel River diversions and the effects of those diversions on fish populations in that river. It also gives only a myopic view of the FERC (Federal Energy Regulatory Commission) proceedings in which flow curtailments from the Eel River have been proposed. Thus, a sufficient "baseline" does not exist from which it can be accurately determined if the Project will, or will not have, a significant impact on the Eel River.

Until this veil is lifted by an adequate description of the environmental setting, as required by the majority opinion, it is premature to find that the Project has no significant impact on the Eel River. I therefore dissent from the majority's holding that the Project will not cause a significant impact on the Eel River. In all other respects, I concur in the opinion.

A petition for a rehearing was denied June 13, 2003, and the opinion was modified to read as printed above.