[No. A124556. First Dist., Div. Five. Oct. 8, 2010.]

SONOMA COUNTY WATER COALITION et al., Plaintiffs and Respondents, v.
SONOMA COUNTY WATER AGENCY et al., Defendants and Appellants.

34

36

**COUNSEL**

Steven M. Woodside, County Counsel, Steven S. Shupe and Cory Wurtzel O'Donnell, Deputy County Counsel; Bingham McCutchen, Stephen L. Kostka, Geoffrey L. Robinson and Marie A. Cooper for Defendants and Appellants.

Kronick Moskovitz Tiedemann & Girard, Eric N. Robinson and Andrew P. Tauriainen for the Association of California Water Agencies, League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Appellants.

Law Offices of Stephan C. Volker, Stephan C. Volker, Joshua A. H. Harris and Bridget A. Roberts for Plaintiffs and Respondents.

OPINION

**BRUINIERS, J.**—The Urban Water Management Planning Act (Wat. Code, § 10610 et seq.; the Act or UWMPA)[1] requires water suppliers in urban areas to adopt water management plans every five years. The Sonoma County Water Agency (the Agency or SCWA) is a water supplier subject to UWMPA. At issue here is the legal adequacy of the Agency's 2005 Urban Water Management Plan (the Plan). Respondents Sonoma County Water Coalition et al. (Coalition)[2] unsuccessfully challenged elements of the Plan before the Agency, and then sought a writ of mandate from the Sonoma Superior Court seeking to enjoin the Agency from adopting or implementing the Plan, and directing the Agency to adopt a legally adequate plan.

The lower court granted the writ on the basis that the Plan (1) failed to provide the detailed water supply information required by UWMPA and (2) was not coordinated with other water supply regulators. The Agency appeals, contending that the trial court failed to accord deference to the expertise and discretion of the Agency, improperly made de novo determinations, and imposed requirements not found in the Act.[3] We agree with the Agency and reverse.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[4]

The Agency is a public entity created by special legislation enacted in 1949. (Stats. 1949, ch. 994, § 1, p. 1793, 71A West's Ann. Wat.—Appen. (1999 ed.) § 53-1 et seq., p. 131.) It is a water wholesaler to eight public agency water

---

[1] All further statutory references are to the Water Code and the uncodified water laws published as its appendix unless otherwise indicated.

[2] In addition to one named individual, respondents include 14 citizen organizations: Sonoma County Water Coalition, the North Coast Rivers Alliance, Westside Association to Save Agriculture, Atascadero Creek Green Valley Creek Watershed Council, O.W.L. Foundation, Russian River Watershed Protection Committee, Bellevue Township, Sebastopol Water Information Group, Friends of the Eel River, Petaluma River Council, Coast Action Group, Blucher Creek Watershed Council, Community Alliance with Family Farmers, and Forest Unlimited.

[3] On March 29, 2010, we granted the joint application of the Association of California Water Agencies (ACWA), the League of California Cities (the League) and the California State Association of Counties (CSAC) to file an amici curiae brief in support of the position of the Agency. ACWA is a voluntary nonprofit statewide organization comprised of public agencies that provide water service to most of California's residents. The League is an association of 474 California cities. CSAC is a nonprofit corporation whose membership consists of California's 58 counties. We refer to these parties collectively as "Amici Curiae."

[4] We caution the reader that the multiplicity of federal, state and local agencies, and overlapping regulatory environments, referenced in this opinion results in our necessary use of a bewildering array of abbreviations and acronyms. We therefore attach a "Rosetta stone" appendix to assist in deciphering these references. (See appen. A, *post*, at p. 64.)

contractors and other retail water suppliers, which use water from the Agency, augmented in some cases by their own local supplies, to provide water service to customers within their service areas. The Agency's water service area covers a large part of Sonoma County and the northern portion of Marin County. It provides potable water to approximately 600,000 people. The Agency's customers include the Marin Municipal Water District, North Marin Water District, City of Petaluma, City of Rohnert Park, City of Santa Rosa, City of Sonoma, Valley of the Moon Water District, Town of Windsor, City of Cotati, Forestville Water District, and the California American Water Company. Its source of supply is the Russian River watershed.

The Agency serves water to its customers pursuant to a restructured agreement for water supply (Agreement), which was entered into in 2006 and extends to 2040. This Agreement sets the maximum amounts of water the Agency is obligated to supply to its customers, and describes the methodology for allocating supplies in times of shortage. The Agency's powers and duties include flood control, wastewater treatment, and power generation. (Stats. 1949, ch. 994, § 3, p. 1794, 71A West's Ann. Wat.—Appen., *supra*, § 53-3, p. 132.) The Agency also maintains watershed and fishery enhancement programs that include riparian restoration projects.

An urban water management plan (UWMP) is prepared and/or updated every five years and addresses the supply of water over the following 20 years. (§§ 10620, 10621, subd. (a), 10631, subd. (a).) The Agency retained the engineering firm of Brown and Caldwell to assist in the preparation of the Plan.[5]

A draft plan was made available for public review on October 30, 2006. The Agency held a noticed public hearing on the Plan on December 5, 2006. (§ 10642.) Comments were submitted by Coalition, among others, challenging several elements of the Plan and contending that it contained "major deficiencies." The Agency's board of directors[6] adopted the Plan on December 12, 2006. As required by law, the Agency submitted its adopted Plan to California's Department of Water Resources for review (§ 10644), which accepted the Plan as complete.

---

[5] The credentials, qualifications and experience of the registered professional engineers who prepared the Plan are set forth in the administrative record. The project manager, Paul Selsky, P.E., is identified as having prepared or directed more than 60 urban water management plans. Coalition makes no challenge to the experience or qualifications of the Agency's retained experts.

[6] The Sonoma County Board of Supervisors serves as the Agency's ex officio board. (Stats. 1949, ch. 994, § 4, p. 1791, 71A West's Ann. Wat.—Appen., *supra*, § 53-4, p. 137.)

Coalition filed a petition for writ of mandate on March 19, 2007. The case was heard based solely upon the administrative record and the pleadings.[7] The trial court issued its decision on October 29, 2008, and granted the peremptory writ. In a comprehensive and detailed written opinion, the court determined that the Plan was not supported by substantial evidence, and failed to comply with statutory requirements. More specifically, the court found the Plan to be deficient in that (1) the Agency "failed to coordinate with relevant agencies" as required by UWMPA; (2) the Plan failed to include the degree of specificity required by UWMPA; (3) the Plan failed to adequately consider certain environmental factors (specifically environmental impacts on endangered salmonid species); (4) the Plan failed to adequately address the effect of recycled groundwater on the future water supply; and (5) the Plan failed to quantify with reasonable specificity the scope of demand management measures relied upon to address anticipated water shortfalls. Judgment was entered on November 26, 2008. The Agency filed a timely notice of appeal.

## II. DISCUSSION

### A. *UWMPA*

"In 1983, the Legislature adopted [UWMPA] to promote the active management of urban water demands and efficient water usage in order to protect the people of the state and their water resources. (Stats. 1983, ch. 1009, § 1.)" (*Friends of the Santa Clara River v. Castaic Lake Water Agency* (2004) 123 Cal.App.4th 1, 8 [19 Cal.Rptr.3d 625] (*Friends of the Santa Clara River*).) In UWMPA, the Legislature declared that "[t]he conservation and efficient use of urban water supplies are of statewide concern; however, the planning for that use and the implementation of those plans can best be accomplished at the local level." (§ 10610.2, subd. (a)(2).) "To achieve the goal of water conservation and efficient use, [local] urban water suppliers are required to develop water management plans that include long-range planning to ensure adequate water supplies to serve existing customers and future demands for water. (§ 10610.2, subds. (d) & (e).)" (*Friends of the Santa Clara River*, at p. 8.) A plan is intended to function as a planning tool to guide broad-perspective decisionmaking by the management of water suppliers. "The plans must consider a 20-year time horizon (§ 10631, subd. (a)) and must be updated 'at least once every five years on or before December 31, in years ending in five and zero' (§ 10621, subd. (a))." (*Friends of the Santa Clara River*, at p. 8.)

UWMPA requires that a plan address a broad range of specific issues. Among other elements, a plan must provide information on a supplier's water

---

[7] The court also received evidence on a standing issue not raised in this appeal.

usage, resources, reliability planning, demand management measures, and shortage contingency planning. (§§ 10631, 10632, 10633.)[8] It also sets forth the procedures that suppliers "must follow when preparing, reviewing, and amending their plans. (§§ 10640–10645; see generally Waterman, *Addressing California's Uncertain Water Future By Coordinating Long-Term Land Use and Water Planning: Is A Water Element in the General Plan the Next Step?* (2004) 31 Ecology L.Q. 117, 162–166 [overview of UWMPA].)" (*Friends of the Santa Clara River, supra*, 123 Cal.App.4th at p. 8.)

The questions we address here are (1) whether a court may weigh conflicting evidence in evaluating the sufficiency of a plan under the Act; (2) what degree of specificity and certainty are required by the Act in addressing the necessary elements of a plan; and (3) what is the scope of an agency's duty under the Act to "coordinate" with other agencies in preparation of a plan?

## B. *Standard of Review*

"In any action or proceeding to attack, review, set aside, void, or annul a plan, or an action taken pursuant to the plan by an urban water supplier on the grounds of noncompliance with this part, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the supplier has not proceeded in a manner required by law or if the action by the water supplier is not supported by substantial evidence." (§ 10651.)

"The role of an appellate court in reviewing an administrative record for a 'prejudicial abuse of discretion' under section 10651 is precisely the same as the role of the superior court and, therefore, the lower court's findings of fact and conclusions of law are not binding on the appellate court. [Citation.]" (*Friends of the Santa Clara River, supra*, 123 Cal.App.4th at p. 9.) In assessing whether the Agency employed the correct procedures, we review the Agency's decision de novo, " 'scrupulously enforc[ing] all legislatively mandated . . . requirements.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*) [applying similar California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) standard under Pub. Resources Code, § 21168.5[9]].) "[W]e accord greater

---

[8] The full text of the current versions of these sections may be found in the attached statutory appendix. (See appen. B, *post*, at pp. 66–72.)

[9] Public Resources Code section 21168.5 similarly provides that "[i]n any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if

deference to [an] agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's [decision] on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' [Citation.]" (*Vineyard*, at p. 435.) Our role in mandamus review of such quasi-legislative administrative decisions is to " 'ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' [Citation.]" (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 577 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*).)

*The Substantial Evidence Standard*

In determining whether an agency has prejudicially abused its discretion, " 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [agency's decision].' " (*Western States, supra*, 9 Cal.4th at p. 571.) The substantiality of the evidence supporting an agency decision is a question of law governed by the same rules used to decide the substantiality of the evidence supporting findings of fact made in a trial court. (*Id.* at pp. 570–571, 573.)

"Substantial evidence is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citations.]" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391 [133 Cal.Rptr.2d 718].) The court indulges all reasonable inferences from the evidence that would support the agency's determinations. (*Western States, supra*, 9 Cal.4th at p. 571.) " 'A court may not set aside an agency's [decision] on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument . . . . We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so.' " (*Id.* at pp. 573–574.)

Our review for substantial evidence applies a deferential standard that is satisfied if "the record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached." (*Great Oaks*

---

the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." Under CEQA, "substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (Pub. Resources Code, § 21080, subd. (e)(1).)

*Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 968 [88 Cal.Rptr.3d 506] (*Great Oaks*).) If more than one inference can be drawn from the evidence, " 'the reviewing court is without power to substitute its deductions' " for those of the agency. (*Western States, supra,* 9 Cal.4th at p. 571.) " 'In general, the court does not weigh the evidence adduced before the agency or substitute its judgment for that of the agency. [Citation.] The court will not concern itself with the wisdom underlying the agency's action.' [Citation.]" (*California Sportfishing Protection Alliance v. State Water Resources Control Bd.* (2008) 160 Cal.App.4th 1625, 1639 [73 Cal.Rptr.3d 560].)

Coalition argued below, and the trial court agreed, that several significant elements of the Plan lacked substantial evidence to support them.[10] The Agency and Amici Curiae contend that the trial court failed to give appropriate deference to the Agency's expertise, and improperly weighed and considered the conflicting evidence and Coalition's arguments in reaching its conclusions. As a result, they argue that the trial court applied a standard of review not permitted by the Act, and one which we may not apply here. We agree.

### C. *Reliability of the Water Supply*

■ UWMPA requires agencies to "[d]escribe the reliability of the water supply" and then, "[f]or any water source that may not be available at a consistent level of use, given specific legal, environmental, water quality, or climatic factors, describe plans to supplement or replace that source with alternative sources . . . ." (§ 10631, subd. (c).) Coalition contends that the Plan failed to adequately address the constraining effect of threatened and endangered species on the reliability of the Agency's water supplies. Thus, they allege, the Plan improperly assumed availability of its future water supplies when the presence of endangered salmonids in the Eel and Russian Rivers creates substantial uncertainty as to the reliability of those sources of supply. Coalition argues that the Act requires "identification and analysis of any future water supply that has the *possibility* of not materializing or the *possibility* of not being available to the extent stated in the plan . . . [, and]

---

[10] As the Agency points out, the extent to which Coalition continues to argue here that the Plan lacks support in substantial evidence is less than clear. Coalition's briefs, and its oral argument, focused instead on what it refers to as the "second prong of the standard of review"—the Agency's purported failure to "proceed in a manner required by law." Thus, they assert that there are substantial legal deficiencies in the Plan "that do *not* pertain to disputed factual conclusions in the record." Nevertheless, as we discuss *post,* the majority of the alleged deficiencies (failure to assess the impact of endangered fish species issues on water availability, failure to address threats to ground and surface water supplies from treated wastewater, and failure to properly account for water conservation) *do* implicate the substantial evidence standard of review.

requires agencies to 'describe plans to supplement or replace th[ose] source[s] with alternative supplies.' (§ 10631[, subd.] (c).)"

1. *Existing Water Supply and Water System*

As summarized by the Agency, and undisputed by Coalition, the Plan describes the existing water resources in two sections—the water system in section 2 and the water supply in section 4. The Agency's water resources and supply facilities within the Russian River watershed are depicted in figure 2-1 of the Plan.

Most of the Agency's water supply comes from water stored in two reservoirs—Lake Sonoma, located in northern Sonoma County on Dry Creek (a Russian River tributary), and Lake Mendocino, located in Mendocino County on the upper Russian River. Lake Sonoma is formed by water impounded by the Warm Springs Dam on Dry Creek and collects runoff from a 130-square-mile drainage area. The lake has a design storage capacity of 381,000 acre-feet of water,[11] which includes 245,000 acre-feet of water supply pool capacity. The Agency also stores water in Lake Mendocino, which is formed by water impounded by the Coyote Valley Dam located on the East Fork of the upper Russian River. Lake Mendocino holds water from a 105-square-mile drainage area together with water diverted by PG&E (Pacific Gas and Electric Company) from the Eel River and released into the Russian River watershed by PG&E's Potter Valley Power Plant (PVP) on the East Fork of the upper Russian River. Lake Mendocino has a design storage capacity of 122,500 acre-feet, including 72,000 acre-feet of water supply pool capacity, which can be expanded in the summer to 86,000 acre-feet.

The Agency has the right to store water in the water supply pools of both reservoirs and to control releases from those water supply pools. Water is released from the two reservoirs and then taken by the Agency from the Russian River using diversion facilities located near Forestville, several miles downstream from the confluence of Dry Creek and Russian River. At its diversion facilities, the Agency pumps water from the underflow of the Russian River, and then transmits it via the Agency's transmission system—a series of manmade pipes, pumps, and storage tanks—to its customers. Under its water rights permits with the State Water Resources Control Board (SWRCB), the Agency has the right to divert and redivert 75,000 acre-feet of water per year from the Russian River. A few of the Agency's customers take water directly from the Russian River, using the Agency's water rights.

---

[11] "An acre-foot is 43,560 cubic feet. Colloquially, it is an irrigation-based measurement equalling the quantity of water required to cover an acre of land to a depth of one foot." (*Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 182, fn. 1 [29 Cal.Rptr.2d 128].)

The United States Army Corps of Engineers (USACE) controls releases from the reservoirs for flood management. The Agency also has the right to directly divert streamflow in the Russian River during certain seasons. The Agency controls water supply releases from Lake Sonoma into Dry Creek. Releases into Dry Creek augment flows in the lower Russian River that supply the Agency's diversion facilities. Flows in the Russian River and Dry Creek are governed by SWRCB water rights decision No. 1610, which requires that minimum instream flows be maintained during the summer months through releases from reservoir storage. (SWRCB, Dec. No. 1610 (Apr. 17, 1986) pp. 47–61.) The flow rates specified in decision No. 1610 are based on a 1985 agreement between the Agency and California's Department of Fish and Game specifying the minimum flows necessary for instream beneficial uses in both Dry Creek and the Russian River. The Agency's reservoir releases are subject to these minimum instream flow requirements, which are incorporated into the Agency's water rights permits.

About 5 percent of the Agency's total water supplies come from ground-water. The Agency operates three groundwater wells located along one of the Agency's transmission pipelines, between Forestville and Cotati.

## 2.  *Proposed Expansion of the Water Supply*

To meet expected future needs, the Plan anticipates increasing the Agency's diversions from the Russian River by an additional 26,000 acre-feet per year. In order to do so, the Agency plans to implement the Water Supply, Transmission, and Reliability Project (the Water Supply Project or WSTRP) to expand its transmission and diversion facilities and capacity.

The Agency had applied to SWRCB for permit amendments allowing it to increase its diversions to a total of 101,000 acre-feet per year, and the Plan projected that the increase in supply would become available in 2016. The Plan concluded that the assumption that SWRCB would approve the increased diversions by 2016 was reasonable because (1) the physical water supply supporting the additional requested diversion already existed in Lake Sonoma; (2) the Agency would have completed its consultation with National Marine Fisheries Service (NMFS; now known as the National Oceanic and Atmospheric Administration Fisheries Service) relating to the federal Endangered Species Act of 1973 (ESA) (16 U.S.C. § 1531 et seq.) compliance for the Water Supply Project by that time; and (3) the 2016 date represented the professional opinion of Agency staff as to the date the increased

diversions would be approved, given the various regulatory processes involved, including CEQA review[12] and completion of the ESA consultation process.

The trial court found uncertainty in two elements of the Plan's proposed future water supply: (1) the Agency's ability to actually increase Russian River diversions from 75,000 acre-feet per year to 101,000 acre-feet per year, and (2) the continued availability of the Eel River water at current levels for use by the Agency. The trial court criticized the Plan's reliance on the assumed approval of the Water Supply Project in the face of the Plan's recognition that "State and federal agencies, including [NMFS] (under ESA) and [SWRCB] (which issues water rights permits) could impose requirements that would change the Water [Supply] Project." The court observed that "Even if the Water [Supply] Project is completed within the anticipated time frame, approval of a permit for an increase in Russian River diversions is tenuous . . . . If [the Agency's] application for the increased diversions [is] rejected, allowing diversions only at the current levels, the projected demand would outstrip the available supplies by 2016 in multiple dry year periods. [Citation.] The UWMPA demands not only a full analysis of the uncertainties of the critical future supply, but equally important, a full discussion of SCWA's 'plans to replace that source with alternative sources.' "

The court correctly noted that the Plan relied on certain assumptions in projecting its water supply. The assumptions on which the Plan's evaluations and conclusions were predicated were explicitly recognized and articulated. The four key assumptions in the Plan were (1) "that the listing of three salmonid species as threatened or endangered under [the ESA] will not reduce the amount of water it can supply"; (2) "that PG&E's existing Federal Energy Regulatory Commission (FERC) license for the [PVP] will not be interpreted or modified, or a new license changed to reduce the amount of water available for diversion by the Agency through its Russian River Diversion Facilities"; (3) "that [the Agency] will construct and operate facilities de-scribed in [WSTRP]"; and (4) that "the Agency will obtain water rights from [SWRCB] to increase its Russian River diversions to 101,000 acre-feet per year by 2016." The Plan noted that these assumptions reflected the Agency's view "about the most likely outcome of decisions of regulatory agencies over the 20-year planning period. The Agency recognizes that regulatory agencies may make different decisions or take different actions than those assumed by the Agency, which may affect the availability of water and the adequacy of the Agency's transmission system. The Agency concludes, given the facts currently available, that the assumptions in this Plan are reasonable, but will monitor the assumptions and update subsequent Plans as necessary." The Plan

---

[12] The Agency had previously prepared an environmental impact report (EIR) for the Water Supply Project, but a legal challenge required preparation of a new EIR, which was then in the process of preparation.

further observed that "[i]f one or more of these assumptions do not come to pass, there are other potential alternative projects that could be evaluated and potentially implemented to mitigate the effect of any reduction in water supply caused thereby. These are discussed in Section 4.7."

The court questioned the validity of these assumptions and essentially agreed with Coalition's position that any plan that fails to identify alternatives to less-than-certain supplies is legally deficient as a matter of law—that if any *possibility* exists that a water source may not be available in the future, the Agency is required to develop a backup plan. Coalition focuses on the use of the phrase "may not be available" in section 10631, subdivision (c), and argues that the term "may" means simply "[t]o be a possibility" (citing Black's Law Dict. (9th ed. 2009) p. 1068). Coalition provides no other authority for the proposition that the Legislature intended such a broad application. As we discuss *post*, we cannot agree that the Act imposes a planning threshold based on a bare possibility, particularly if there is substantial evidence supporting the Agency's contrary conclusion.

As Amici Curiae observe, and as the voluminous record below amply demonstrates, some level of uncertainty is "a permanent, inherent feature of modern water management. It arises from a wide range of scientific and legal regulatory factors that cannot be avoided." Water management is subject to the vagaries of climate, competing demands from agricultural, industrial and residential uses, environmental constraints, and overlapping regulatory regimes at both the federal and state levels. In rejecting the Agency's conclusions, the court required a level of certainty not factually attainable and not required by the statute, and substituted its own judgment as to the reasonableness of the assumptions relied upon by the Agency. This was error.

The issue that we must consider, and the question that the trial court should have addressed, is not whether alternative assumptions would have been reasonable, or perhaps even more reasonable than those made, but whether the assumptions that were made are supported by substantial evidence. We find that they are.

D. *Endangered Fish Species*

1. *NMFS Issues*

The Plan acknowledged that two salmonid species found in the Russian River watershed—Chinook salmon and steelhead—had been listed as "threatened" under the ESA, and one species—coho salmon—had been listed as "endangered" under both the ESA and the California Endangered Species Act (Fish & G. Code, § 2050 et seq.). As a result of a 1997 agreement between

the Agency, USACE and NMFS, an assessment was made under section 7 of the ESA of the impact of the Agency's water supply operations on these species. The Russian River Biological Assessment (the Biological Assessment) was submitted to NMFS in 2004. The purpose of the Biological Assessment was to provide a basis for NMFS to issue a biological opinion on the impact of the Agency's operations on endangered salmonid species and their habitat.[13] It proposed structural changes to the Agency's facilities, operations, and maintenance procedures, concluding that the changes would benefit the endangered salmon species while providing "balance between activities that would provide essential services like water supply and flood control and potential adverse effects to listed salmonids and to the ecosystem on which they depend."

The Biological Assessment opined that flow levels in the Russian River and Dry Creek might be higher than optimal for the listed species, and contained a proposal to reduce instream flow requirements for both the Russian River and Dry Creek (the Flow Proposal). The effects of the Flow Proposal were analyzed using computer models—the Russian River System Model and Russian River Water Quality Model—to predict daily flow, temperature, and other variables at specific locations along the Russian River and Dry Creek. The analysis concluded that the Flow Proposal would (1) improve the quality and quantity of summer rearing habitat for salmonids in the Russian River and Dry Creek; (2) provide sufficient water to satisfy the Agency's existing water demands; and (3) provide sufficient water to meet future demands on the Agency's system, assuming implementation of the planned Water Supply Project.

The Plan acknowledged that it was uncertain what flow modifications NMFS might require the Agency to undertake, or the extent to which flow restrictions might be approved by SWRCB, but concluded that it was reasonable to assume that any restrictions would not reduce the amount of water that the Agency could supply, and would take into consideration the habitat conservation and restoration projects the Agency had undertaken. The Agency noted its long-standing cooperative relationship with NMFS and believed it was reasonable to assume that, while this might impose some constraints under the ESA, the NMFS biological opinion would also contain "reasonable and prudent alternatives" that would allow the Agency to meet the water supply demands of its contractors and customers.

The trial court disagreed and concluded that the Plan was "inherently inconsistent" because it "admit[ted] that [the NMFS] Biological Opinion 'may require the Agency to modify its water supply facilities or operations,' "

---

[13] The Agency advises us that a biological opinion was issued by NMFS in 2008, but that document was not part of the record below and is not part of the record before us.

which, the court concluded, "directly undercuts the Plan's assumption that 'ESA constraints will not affect or impair the water supply available to the Agency for delivery,' and throws substantial doubt on the reliability of the Agency's key water supplies in the future." The trial court found that the Biological Assessment "explicitly states that the actions taken to protect [salmonids] will *reduce* water supplies available to the [Agency]." It further found that the Agency's ability to increase the amount of water it supplies to its contractors and customers in the future would be hampered by ESA constraints imposed by NMFS. It held that section 10631, subdivision (c) "demands not only a full analysis of the uncertainties of this critical future supply, but equally important, a full discussion of [the Agency's] 'plans to replace that source with alternative sources.' "

The Biological Assessment actually came to a very different conclusion and did not determine that the Flow Proposal's recommendations would threaten the Agency's water supplies. The Biological Assessment instead concluded that existing and future demand levels could be met under the Flow Proposal without any significant changes to the Agency's operations. The Biological Assessment evaluated the potential impacts of a variety of activities in the Russian River watershed on listed salmonid species and their habitat, including USACE flood control operations; dam operation and maintenance; hydroelectric operations; flow and estuary management; channel maintenance for flood control and water supply needs; operation of fish production facilities and water supply and transmission operations. The Biological Assessment proposed a number of mitigation measures to improve habitat conditions for the salmonid species, including structural and operational changes at Warm Springs Dam, Coyote Valley Dam, and the Agency's diversion facilities, modified channel maintenance and management activities, changing fish production facility operations, eliminating breaching of the sandbar at the mouth of the Russian River during the summer, and developing water supply measures to meet future demand while protecting fish habitat.

The Flow Proposal was one of "a suite of alternative flow proposals to improve conditions for salmonids, while continuing to meet the water supply needs of the region," and was designed to improve habitat conditions "while continuing to meet water demands now and in the future at the water demand levels projected in [WSTRP]." The conclusion in the Biological Assessment was that WSTRP "would provide a safe, economical, and reliable water supply to meet future needs in the [Agency's] service area."

Coalition points to an April 2006 letter submitted by the Agency commenting on Sonoma County's proposed general plan 2020 draft EIR, in which Coalition contends that the Agency "*unambiguously admitted* that its future

supplies are uncertain." In its comments, the Agency stated that "changes in regulations to protect listed salmonids *could affect* the Agency's ability to deliver the full allocation allotted under the [current contracts]." (Italics added.) However, certainty was not what the Agency claimed nor, as we discuss *post*, what the Act requires.

While acknowledging uncertainty as to what modifications NMFS might ultimately require the Agency to implement, the Plan concluded that "given the analysis set forth in the Biological Assessment and the Agency's ongoing communications with NMFS' staff, it is reasonable to assume that with the implementation of mitigation measures, ESA constraints will not affect or impair the water supply available to the Agency for delivery to its transmission system customers." That conclusion was supported by substantial evidence.

### 2. *The Eel River Flows*

The trial court also questioned the Plan's assumption that FERC (Federal Energy Regulatory Commission) licenses for PG&E's PVP would not be further modified to require flow adjustments from the Eel River in order to protect the endangered salmonid species.[14] The Plan concluded that it was reasonable to assume that the FERC license would not be changed in such a way as "to reduce the amount of water available for diversion by the Agency through its Russian River Diversion Facilities."

Pursuant to its FERC license, PG&E diverts water from the Eel River to generate power at PVP. (*Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 865–866 [134 Cal.Rptr.2d 322] (*Friends of the Eel River*).) An average of about 160,000 acre-feet per year are diverted from the Eel River Basin into the Russian River Basin. (*Pacific Gas and Electric Company* (Jan. 28, 2004) 106 F.E.R.C. ¶ 61,065, p. 61,207 [order amending license].) Some of this water is then released into the East Fork of the upper Russian River pursuant to a 1965 agreement between PG&E and the Agency and PG&E's FERC license, and ultimately flows into Lake Mendocino.[15] (*Friends of the Eel River*, at p. 866.) "[M]ost

---

[14] The Agency noted that on June 2, 2004, FERC had amended PG&E's license based on a NMFS biological opinion issued under the ESA.

[15] Under the terms of the 1965 agreement, "PG&E directs water from the Eel River into the Russian River and, in exchange, the Agency maintains dams and other structures associated with the PVP." (*Friends of the Eel River, supra*, 108 Cal.App.4th at p. 875.) The license terms were amended in 1983, as a result of a settlement agreement between PG&E, California's Department of Fish and Game, the Counties of Humboldt, Mendocino, and Sonoma, the Mendocino County Russian River Flood Control and Water Conservation Improvement District, and the Agency. (*Pacific Gas and Electric Company, supra*, 106 F.E.R.C. ¶ 61,065, p. 61,208 [order amending license].)

of the summer water flow in the Russian River consists of water diverted from the Eel River." (*Ibid.*, italics omitted.)

The Plan discussed the factors on which it based its conclusion that FERC would be unlikely to further significantly reduce PVP diversions. The Agency acknowledged that the diversion of water from the Eel River watershed into the Russian River watershed has been a source of controversy. It noted, however, that because diversion had been ongoing for almost 100 years, and because extensive agricultural, municipal and commercial economies had developed during that time relying on those diversions, it was reasonable to assume that PVP diversions into the Russian River watershed would continue.

In reaching its conclusion that the FERC license would not be further modified in a manner that would reduce diversions to the Russian River watershed, the Agency considered that, in the prior license amendment proceedings, FERC had explicitly recognized the importance of the PVP diversions to Mendocino and Sonoma Counties, in both an EIR and in its previous orders.[16] It also noted that the PVP license served multiple purposes, "including power generation, . . . agricultural irrigation, and summer flow augmentation in the middle and upper Russian River." Further, the early fall releases of water stored in Lake Mendocino made available by PVP diversions are beneficial to the fall migration of threatened Chinook salmon in the Russian River watershed, as acknowledged in an SWRCB order approving temporary reduction of flows above Healdsburg in order to conserve water in Lake Mendocino for the benefit of Russian River salmon.

██ Coalition cites to comments made by the Agency in the prior FERC/PG&E licensing proceeding (FERC Project No. 77-110). In that proceeding, PG&E and NMFS, along with two other wildlife agencies, filed a proposal to decrease the amount of water diverted from the Eel River to the Russian River by 22 percent. (*Friends of the Eel River, supra,* 108 Cal.App.4th at p. 866.) The Agency opposed this proposal and "put forward an alternate proposal for curtailing diversions from the Eel River by 10 percent by the year 2022. In so doing, the Agency pointed out that cutting off Eel River water to the extent proposed in the [PG&E recommendation] would have

---

[16] FERC's decision in that proceeding recognized that " '[b]oth [the National Environmental Policy Act] and section 10(a)(1) [of the Federal Power Act] require consideration of the effects of proposed [PVP flow] actions on, respectively, the environment and other public interest uses of the waterways.' " In an unpublished decision, the Ninth Circuit denied petitions to review the FERC licensing orders, rejecting, among other issues, a claim that FERC should not have balanced the interests of Russian River water users against the interests of the Eel River fisheries. (*Cal. Sportfishing Protection v. F.E.R.C.* (9th Cir. 2006) 193 Fed.Appx. 655, 659.) The court held that "[b]oth [the National Environmental Protection Act] and the Federal Power Act require FERC to consider how its actions affect all aspects of the public interest. [Citation.]" (*Ibid.*)

severe environmental consequences to the Russian River, including the risk of dewatering portions of that river during critically dry years because of the impossibility of maintaining 'prudent water storage reserves.' " (*Id.* at pp. 866–867.) In *Friends of the Eel River*, the court concluded that failure to discuss the then proposed Eel River diversion curtailments rendered the Agency's EIR (for the Water Supply Project) defective. (*Id.* at pp. 872, 874–875.) But the Act expressly exempts preparation of a plan from the requirements of CEQA.[17] (§ 10652.)

■ Again, Coalition argues that since the Agency has recognized the possibility that FERC could further reduce the PVP flows,[18] and "[i]f there is a 'possibility' that the [FERC] license may be 'modified . . . in a way that would reduce' the Agency's future water supplies . . . then that water source . . . '*may* not be available at a consistent level of use' in the future," triggering a duty to consider and discuss alternatives under section 10631, subdivision (c). Again, we disagree that the existence of a "possibility" of an adverse circumstance, which a water supplier, based on substantial evidence, concludes is unlikely to occur, requires a supplier to construct alternative scenarios. In determining if substantial evidence supports the conclusion reached by the Agency, we look to "whether the record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached." (*Great Oaks, supra*, 170 Cal.App.4th at p. 968.) Even if we might also readily draw the inferences which Coalition urges us to accept, there is nevertheless substantial evidence in support of the Agency's contrary conclusion, precluding a reviewing court's consideration or evaluation of conflicting evidence or inferences.

It was error for the court to substitute its judgment for that of the Agency, and in doing so it failed to give appropriate deference to the Agency's expertise. (*County of Sacramento v. State Water Resources Control Bd.* (2007) 153 Cal.App.4th 1579, 1586 [64 Cal.Rptr.3d 302].) " 'In general, the court does not weigh the evidence adduced before the agency or substitute its judgment for that of the agency. [Citation.]' " (*California Sportfishing Protection Alliance v. State Water Resources Control Bd., supra*, 160 Cal.App.4th at p. 1639.) There was substantial evidence to support the Agency's conclusion, i.e., " 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citations.]" (*Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th at p. 1391.)

---

[17] "[CEQA] (Division 13 (commencing with Section 21000) of the Public Resources Code) does not apply to the preparation and adoption of plans pursuant to this part or to the implementation of actions taken pursuant to Section 10632 . . . ." (§ 10652.)

[18] The Plan assumes the diversion flows provided in the PG&E license as amended in 2004.

### E.  *The Water Supply Project*

To provide for the Agency's proposed additional 26,000 acre-feet per year diversions from the Russian River, the Agency needed to expand its transmission and diversion facilities and capacity by implementing WSTRP. The Plan assumed "that [the Agency] will construct and operate facilities described in [WSTRP]."

Coalition claims that the Agency unequivocally acknowledged the uncertainty of its ability to construct and operate these facilities in its April 2006 letter to the County of Sonoma, admitting that further environmental review of WSTRP was required as a result of litigation, and that SWRCB approval of the additional diversions was still required. Coalition asserts that these admissions are *"irrefutable evidence* that the Plan was premised on a false assumption—one that the Agency itself knew was incorrect." Thus, they insist, the Plan improperly relies on "paper water."[19]

The Agency responds that "the Plan fully disclosed that its conclusions about expansion of its water supplies were based upon the outcome of future regulatory decisions that could not be predicted with certainty, and [that] this analysis was entirely consistent with the statements it made in its letter" to the County commenting on the general plan 2020 draft EIR. The Plan acknowledged that the prior EIR for WSTRP had been set aside in earlier litigation (*Friends of the Eel River, supra*, 108 Cal.App.4th 859)[20] requiring that "[t]he new water project must undergo environmental review in accordance with [CEQA] and obtain project approval before it can proceed." The Biological Assessment likewise noted that "SCWA must complete a supplemental environmental review of the program-level impacts of [WSTRP], and the SCWA Board of Directors must consider the analysis when determining whether to approve [WSTRP]. . . . The actual water supply facilities and diversions from the Russian River that the SCWA Board of Directors may approve in the future may differ from those contemplated in [WSTRP]." Coalition speculates that the CEQA process might "produce new, critical information about the Project's impacts" and contends that the Plan "ignores the possibility that the required further CEQA review might change the Water [Supply] Project or cause the Agency to deny it." They argue that the Plan

---

[19] "Paper water" is a term referring to illusory or speculative resources that are "nothing more than 'hopes, expectations, [or] water futures.'" (*Vineyard, supra*, 40 Cal.4th at p. 430; see *California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219, 1228 & fn. 5 [35 Cal.Rptr.3d 434].)

[20] As discussed above, our colleagues in Division One held that the EIR failed to adequately discuss the cumulative impact of WSTRP and a proposal then pending before FERC to curtail diversions from the Eel River to protect salmonid species, and that the EIR failed to provide an accurate description of the project's environmental setting. (*Friends of the Eel River, supra*, 108 Cal.App.4th at p. 881.)

was further required to discuss "the potential that the Agency's further CEQA review will not pass muster in the courts."

As discussed above, the trial court found that reliance on the assumed approval of WSTRP was inappropriate since the Agency acknowledged that "State and federal agencies, including [NMFS] (under ESA) and [SWRCB] (which issues water rights permits) could impose requirements that would change the Water [Supply] Project." The court further found that SWRCB approval of a permit to increase Russian River diversions was "tenuous" and that without additional diversions, "projected demand would exceed available supplies by 2016 in multiple dry year periods." Therefore, "a full discussion of SCWA's 'plans to replace that source with alternative sources'" was required.

■ Section 10631, subdivision (h) requires that a plan "[i]nclude a description of all water supply projects and water supply programs that may be undertaken by the urban water supplier to meet the total projected water use" and to "include a detailed description of expected future projects and programs . . . that the urban water supplier may implement to increase the amount of the water supply available to the urban water supplier in average, single-dry, and multiple-dry water years. The description shall identify specific projects and include a description of the increase in water supply that is expected to be available from each project. The description shall include an estimate with regard to the implementation timeline for each project or program."

We agree with the Agency that implicit in the language of section 10631, subdivision (h) is the legislative recognition that long-term water planning involves expectations and not certainties. Our Supreme Court has recognized the uncertainties inherent in long-term land use and water planning, and observed that the generalized information required by statutes such as section 10910 (requiring a water supply analysis for proposed development projects) in the early stages of the planning process are replaced by firm assurances of water supplies at later stages. (*Vineyard, supra*, 40 Cal.4th at pp. 433–434 [" 'water supplies must be identified with more specificity at each step as land use planning and water supply planning move forward from general phases to more specific phases' "].) The interpretation urged by Coalition, and ultimately accepted by the trial court, would effectively prohibit suppliers from relying on additional supplies from any planned future water projects or programs, since new or expanded supply sources would always have "the *possibility* of not materializing or the *possibility* of not being available to the extent stated in the plan." But that same reasoning (and the requirement for CEQA compliance) would apply equally to any alternative or replacement source, requiring detailed description and analysis of contingencies upon

contingencies for theoretical circumstances that might never arise. As the Agency observed in the Plan, "[i]n order to base the water supply analysis in this Plan on an alternative assumption, the Agency would have to select a specific alternative assumption out of a universe of potentially available assumptions. The Agency's reliance on existing conditions instead of some speculative future alternative is reasonable and appropriate."

Coalition's reliance on *Friends of the Santa Clara River, supra,* 123 Cal.App.4th 1, is misplaced. In that case the Fifth District Court of Appeal ordered approval of a UWMP vacated for failure to adequately describe the reliability of the water agency's groundwater supply, and for failing to address timing issues relating to remediation of identified perchlorate contamination, rendering the plan legally inadequate. (*Id.* at p. 14.) There was undisputed record evidence of a significant area of contamination in one of the agency's two aquifers, shutting down 25 percent of the wells in the aquifer, and evidence that the contamination was the "leading edge" of a much larger migrating plume of contaminants. (*Id.* at p. 10.) The UWMP referred only to " 'a groundwater cleanup plan . . . being developed' [citation] to address the perchlorate contamination," but did not discuss the stage of development of the cleanup plan or the schedule to complete and implement that plan. (*Id.* at pp. 12–13.) "As a result of the failure to describe the timing, the UWMP also [did] not describe plans to replace contaminated sources with alternative sources of water until the treatment option is implemented. [Citation.]" (*Id.* at p. 12, fn. 11.) The court found the plan "fatally flawed" without an appropriate analysis of the reliability of the water supply. (*Id.* at p. 15.) *Friends of the Santa Clara River* dealt with the reliability of *existing* available sources of water in the face of a concrete and identified threat which had already significantly curtailed the access of the agency to one of its aquifers. (*Id.* at p. 9.) Nothing in that case suggests that an agency is required to negate any *possibility* that its future projects might not be achieved, or to establish a level of certainty of implementation impossible to achieve.

■ If substantial evidence supports a water supplier's resource assumptions, it would be wasteful of the Agency's resources if it were nevertheless required to focus on development of detailed plans for alternatives that its own experts view as improbable. We find nothing in the Act that requires it to do so.

F. *Water Quality Issues*

■ The Act requires that a plan must "include information, to the extent practicable, relating to the quality of existing sources of water available to the supplier . . . and the manner in which water quality affects water management

strategies and supply reliability." (§ 10634.) If a plan indicates that water quality problems will adversely affect reliability, the plan must then identify alternatives: "For any water source that may not be available at a consistent level of use, given specific . . . water quality . . . factors, [the plan must] describe plans to supplement or replace that source with alternative sources or water demand management measures, to the extent practicable." (§ 10631, subd. (c).)

The Plan concluded that "no impacts to water supplies due to water quality deficiencies are foreseen to occur in the next 25 years." Coalition argues that this conclusion was not supported by substantial evidence because the Agency was aware of, and had itself expressed concerns in a September 2006 letter, about the City of Santa Rosa's plans for direct and indirect discharge of treated wastewater along the Russian River watershed in areas above the Agency's diversion facilities.[21] Accordingly, they assert that "the long-term availability of potable water may be . . . threatened in areas whose surface or groundwater may be contaminated by treated sewage," and the Plan violated UWMPA because it ignored this hazard to the quality of the Plan's presumed water supply.

The Plan discussed the Agency's water treatment and natural filtration processes and concluded that "[t]he quality of the Agency's surface and groundwater supply sources over the next 25 years is expected to be adequate." The trial court disagreed and found that releases of treated wastewater might adversely affect the Agency's groundwater and river supplies. The court held that the Plan was therefore required to have considered the "potential impact" of "any future project to discharge wastewater to the Russian River" and that the Plan should have "address[ed] threats to [the Agency's] water supply from the planned use of treated sewage water for irrigation."

Of course, the Plan did not address this "threat" to the water supply because the Agency and its experts did not conclude that DCP presented a

---

[21] The letter was submitted in comment on an "Initial Study, Notice of Preparation of an [EIR], and Draft Engineering Report for the City of Santa Rosa's . . . Incremental Recycled Water Program—Discharge Compliance Project" (the Discharge Compliance Project or DCP). A notice of preparation initiates a formal scoping process under CEQA to identify the issues that should be analyzed when an EIR is prepared for a proposed project. (Cal. Code Regs., tit. 14, § 15082.)

The letter expressed concerns about potential conflicts with the proposed expansion of the Agency's facilities under WSTRP, potential water quality concerns that could impact the way the Agency's facilities were operated, and possible impact on the salmonid species and recovery planning efforts for those species. The Agency encouraged the City to consider alternatives to the discharges.

threat that would adversely affect its supply reliability. The Agency's comments in the CEQA scoping process requested analysis of alternative wastewater management approaches or mitigation measures to prevent any significant water supply impacts. The trial court held that "[e]ven though any future project to discharge wastewater to the Russian River or for the beneficial use of recycled water would be subject to CEQA requirements, the potential impact of such eventuality must be considered in connection with the Plan."

The Agency correctly observes that at the time the Plan was written there was no specific DCP proposal to be considered. No specifics as to the size, timing, location, or nature of any discharge had been determined, nor had any determination been made as to the type and level of treatment to which the discharged water would be subject—if it were to occur at all.[22] As Amici Curiae note, the CEQA process is "intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects" and articulates a public policy that projects should not be approved "if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects." (Pub. Resources Code, § 21002; see *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 203 [139 Cal.Rptr. 396].) An EIR must also describe all reasonable alternatives to the project. (Pub. Resources Code, § 21061.) Further, wastewater discharges to rivers are highly regulated and must comply with the Regional Water Quality Control Board's discharge and permitting requirements under the Porter-Cologne Water Quality Control Act (§ 13000 et seq.; see §§ 13260, 13263, 13370). Permits for wastewater discharges are also subject to the federal Clean Water Act. (33 U.S.C. § 1251 et seq.)

Any "threat" posed by DCP was at best speculative and hypothetical at the time the Plan was prepared. The Act's requirement that plans be updated on a five-year cycle provides ample opportunity for the Agency to address and respond to maturing and tangible risks to long-term water supply projections. Although others might well assess the significance of the risk presented by DCP differently, it was again error for the court to substitute its judgment for that of the Agency.

---

[22] The Agency also observes that the City of Santa Rosa is one of its customers, receiving most of its water supplies from the Agency, and that it would be "highly unlikely that [it] would approve an unmitigated discharge alternative that would contaminate its own water source."

G. *Water Demand and Water Conservation*

■  Under the Act, plans must include an estimate of the water savings attributable to implementation of the conservation measures. (§ 10631, subd. (f)(4).) The Plan addresses water conservation in section 6.

Coalition contends that the Plan is invalid because it "fails to explain how, when, and to what extent the Agency's water conservation programs will reduce water demand." They criticize the Plan for failure to describe the Agency's "programs and the extent to which they have been implemented and are projected to reduce demand . . . [and for failure to] include any supporting data to demonstrate the projected water savings." The trial court found that failure to include supporting data to demonstrate water savings from participation in the California Urban Water Conservation Council (CUWCC), and failure to identify dates by which other measures would be in effect resulted in absence of substantial evidence to support this element of the Plan.

The Plan notes that the Agency is a participant in CUWCC, and that the Agency and all of its water contractors are signatories to a CUWCC Memorandum of Understanding Regarding Urban Water Conservation (MOU) pledging good faith efforts to implement water demand management measures (referred to as "best management practices" or BMP's) identified in the MOU. Table 6.1 of the Plan lists certain of these BMP's (tier 1 BMP's) and identifies which are being implemented by the Agency. The Plan states that its demand projections assumed future implementation of "four levels of increasing conservation effort," including tier 2 BMP's (listed in table 6.2) and other conservation measures, and that these assumptions were integrated in calculations with current water usage using decision support system (DSS) software models approved by CUWCC.[23] It further notes that "[b]ecause the water conservation savings are projections, actual demand reduction and the manner in which the demand reduction is achieved may vary."

Former section 10631, subdivision (j) (as amended by Stats. 2004, ch. 688, § 1, repealed by Stats. 2009, ch. 534, § 1) provided that: "Urban water suppliers that are members of [CUWCC] and submit annual reports to that council in accordance with the [MOU], dated September 1991, may submit the annual reports identifying water demand management measures currently

---

[23] The Plan explains that "DSS analysis projects on an annual basis the water savings and the dollar values of the benefits and costs that would result from implementing the BMPs."

being implemented, or scheduled for implementation, to satisfy the requirements of subdivisions (f) and (g)."[24] The annual BMP reports submitted by the Agency to CUWCC are attached as appendix B to the Plan.[25]

Coalition acknowledges the provisions of section 10631, subdivision (j), and admits that the Agency meets the requirements of the statute, but argues that the Plan was nevertheless deficient because it did not "quantify its expected water savings and thus hides its assumptions in the Plan," and because it did not comply with section 10615 (requiring description and evaluation of "demand management activities" and "measures for residential, commercial, governmental, and industrial water demand management").

We cannot agree. To accept Coalition's position would require us to ignore the plain meaning of section 10631, subdivision (j) and would effectively read it out of the Act entirely. The Agency provided the required information in the Plan, in the form required by the Act, and substantial evidence supported its determinations in this area.

## H.   *The Coordination Requirement*

Coalition contends that the Agency did not proceed in the manner required by law and thus violated UWMPA by failing to coordinate with several state and federal agencies, including USACE, SWRCB, FERC, and NMFS. The trial court agreed.

Section 10620 provides that "[e]ach urban water supplier shall coordinate the preparation of its plan with *other appropriate agencies in the area,* including *other water suppliers that share a common source, water management agencies,* and *relevant public agencies, to the extent practicable.*" (§ 10620, subd. (d)(2), italics added.) Coalition complains that the Agency coordinated only with its customers and its water retailers, "thus conferring

---

[24] The operative version of section 10631, subdivision (f) currently, and at all relevant times, has provided that a plan shall include "a description of the supplier's water demand management measures . . . ." Section 10631, subdivision (g) similarly has provided that a plan shall include "[a]n evaluation of each water demand management measure listed in paragraph (1) of subdivision (f) that is not currently being implemented or scheduled for implementation. . . ."

[25] The Department of Water Resources also states that "[UWMPA] provides two distinct methods for providing information related to Demand Management Measures (DMMs) and meeting the requirements of [section] 10631, [subdivisions] (f) and (g). [¶] 1. A water supplier who is a member of [CUWCC] may submit their BMP Activity Reports (Annual Reports) . . . . [¶] OR [¶] 2. A water supplier who is not a member of [CUWCC], or chooses not to submit [CUWCC] BMP Activity Reports, must include the following data on implementation of DMMs in the UWMP . . . ." (Dept. of Wat. Resources, Guidebook to Assist Water Suppliers in the Preparation of a 2005 Urban Water Management Plan (Jan. 18, 2005) p. 23.)

only with agencies influencing *demand*, and ignoring those controlling *supply* . . . ." They assert that USACE, FERC, NMFS, and SWRCB were "appropriate agencies for the Agency to consult during the Plan's preparation because they control the Agency's primary water supply: the Russian River." Since these regulatory agencies "ultimately control the quantity and quality of the Russian River's future water supplies," and "possess operational knowledge essential to responsible water planning," Coalition argues that the Agency was required to obtain "input" from these agencies in order to comply with UWMPA.

The Agency and Amici Curiae argue that the requirement to "coordinate" the Plan is an element of the legislative emphasis on localized water planning (§ 10610.2, subd. (a)(2)), focusing on other agencies "in the area," and is principally intended to provide for regional consistency and to ensure that other water suppliers do not make conflicting demands on the same limited resources. They assert that none of these federal or state agencies fall within the ambit of agencies "in the area," nor are they "water suppliers that share a common source" or "water management agencies." Further, they contend that the Agency properly exercised its discretion in determining what other agencies were "appropriate" or "relevant" to preparation of its Plan.

The trial court held that the Act requires a water supplier to present a draft of its plan to any agency with authority to issue decisions that can affect the supplier's water supplies, solicit comments, and determine whether the agency agrees with the Plan's "findings, conclusions, and solutions." The court found that USACE "shares a common source with the SCWA, and that it is a 'relevant public agency' as contemplated by the Act." It held that the Agency was required to consult with FERC as to "future supply and demand" because it "has a regulatory role in managing the Agency's facilities and supplies." NMFS had to be consulted because it had a "role in controlling water releases from water sources shared by the [Agency]." Finally, the court determined that it was necessary to seek input from SWRCB as it "controls whether or not the [Agency] will be able to receive permits to release additional water." Accordingly, "SWRCB participates and to an extent controls a common water source and is involved in the water management process. Clearly, the participation of this agency would be considered relevant to the purposes required to be addressed under the Act." As to the four regulatory agencies at issue here, the court found the Plan was deficient because there was "no evidence in the administrative record that any of these agencies was presented with the proposed Plan prior to adoption, particularly as to the potential shortfalls." We find no such requirement in the Act.

In the first instance, we agree with the Agency and Amici Curiae that none of the four agencies that court identified, even if considered "in the area," fall

within the specifically identified categories in the Act. They are not "water suppliers that share a common source," and only SWRCB is a "water management agency," albeit not a local one. USACE, which owns Warm Springs Dam and Lake Sonoma, does not supply water to anyone, and it operates the reservoirs for flood control purposes, not for water supply. The Agency stores water in these reservoirs pursuant to agreement with USACE and has the exclusive contractual right to control releases from those water supply pools. USACE has authority only over flood control releases from these reservoirs during the winter rainy season from reservoirs' flood control pools. The Agency does not rely on these flood control releases for its water supply. FERC is responsible for licensing hydroelectric facilities and does not "supply" water to the Agency. FERC licenses PG&E to divert water from the Eel River for purposes of generating hydroelectric power, and to discharge that water into the East Fork of the Russian River. NMFS has regulatory authority over the endangered salmonid species in the Russian River, but it does not operate water supply facilities or provide water to anyone. Likewise, SWRCB is a statewide regulatory body which allocates and determines water rights,[26] but which does not manage any water supply facilities in the area, or with a "common source."

 ■   The Agency argues that the trial court, in requiring the Agency to submit its Plan to regulatory agencies for comments or input, created a broader requirement for *consultation* that is not imposed by the Act. Nothing in the plain language of the Act mandates consultation with another agency in preparation of a plan simply because that agency may have regulatory authority ultimately affecting the Agency's resources. Further, it is difficult to see how those regulatory authorities could offer "insights" into prospective decisions before the proceedings leading to those decisions are concluded, or why the Agency would be compelled to seek "input" from an administrative agency unlikely to be able to provide it. As Amici Curiae observe, obtaining "input" or "insights" from at least some of the agencies would be impracticable because the Agency is a party to permit applications in which ex parte communications are prohibited. SWRCB water rights proceedings, for example, are adjudicatory and expressly subject to the prohibition on ex parte communications. (Gov. Code, § 11430.10; see SWRCB, Ex Parte Questions and Answers (Sept. 17, 2008) pp. ·3–4 <http://www.swrcb.ca.gov/laws_regulations/ docs/exparte.pdf> [as of Oct. 8, 2010].) As the Agency also notes, and as reflected in the administrative record, its staff has extensive and regular

---

[26] "The Legislature hereby finds and declares that in order to provide for the orderly and efficient administration of the water resources of the state it is necessary to establish a control board which shall exercise the adjudicatory and regulatory functions of the state in the field of water resources. . . ." (§ 174.)

contact with staff from each of these agencies, and regularly consults with them in any event about issues relevant to the Agency's water supply.

Certain procedures for review and comment by the public, including a noticed public hearing, are mandated in the preparation of a plan. (§ 10642.) The requirement for coordination with other agencies limits that requirement to certain categories—those "appropriate" agencies "in the area," including "other water suppliers that share a common source," "water management agencies," and "relevant public agencies," "*to the extent practicable.*" (§ 10620, subd. (d)(2), italics added.) Nothing in the Act specifies the type or degree of coordination required nor does it otherwise enumerate or identify those agencies which are "appropriate" or "relevant." It is evident that the statute provides a water supplier with considerable discretion in determining which agencies to include in the process.

The question is whether the Agency acted within its discretion in assessing if these were "appropriate" or "relevant" agencies, with which coordination was "practicable," or whether coordination was mandated by what Coalition contends is a legislative imperative to consult with those controlling its supply. Certainly the legislature could easily have expressly imposed such a requirement had it intended to do so. It did not.

We find nothing in section 10620, subdivision (d)(2), or elsewhere in the Act, creating the requirements that Coalition seeks to impose, nor does the record show that the Agency abused its discretion in determining the appropriate or relevant agencies with which to coordinate its planning efforts. We find no basis to substitute our judgment for that of the Agency.

## I. *Conclusion*

In concluding that the Plan at issue here is supported by substantial evidence and is in compliance with the requirements of the Act, we do not minimize the critical importance of a thorough and adequate UWMP. Water is a scarce resource in California. (See 1 Slater, Cal. Water Law and Policy (2009) § 1.02, pp. 1-2 to 1-8 (rel. 10-6/2005).) The Legislature has recognized the critical importance of water planning in not only the Act, but in a variety of enactments. (E.g., § 13240 [requiring regional water boards to adopt a water quality control plan for all areas in region]; see *County of Sacramento v. State Water Resources Control Bd., supra,* 153 Cal.App.4th at p. 1583; § 10910 [requiring an assessment of water demand and water supply in CEQA review of development projects].) If a UWMP is inadequate "[t]he public and the various governmental entities that rely on the UWMP may be seriously misled by it and, if the wrong set of circumstances occur, the consequences to those who relied on the UWMP, as well as those who share a

water supply with them, could be severe." (*Friends of the Santa Clara River,* *supra,* 123 Cal.App.4th at p. 15, fn. omitted.)

But here the Plan was clear as to its assumptions, which were based on existing conditions and anticipated completion of projects already in progress, which were equally clear as to their limitations, and for which the Agency had factual support. The Plan was not deficient for failing to assert a level of certainty in its anticipated water supply that could not be justified, or for failing to plan an alternative supply which would necessarily be at least equally uncertain. It did not mislead. The Agency was not required to plan based on alternative hypothetical scenarios its experts considered unlikely to occur, rather than focusing its resources on those circumstances it reasonably anticipated. It was not required to consider all possible eventualities. A UWMP is also not intended to be a substitute for more detailed project-specific planning documents, such as those required under CEQA. (Cf. *Vineyard, supra,* 40 Cal.4th at p. 432 ["EIR for a land use project must address the impacts of *likely* future water sources, and the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability"].)

As reflected in the detailed analysis and decision by the trial court, Coalition may well have presented "fair argument"[27] in support of its critiques of the Plan, and reasonable minds may differ on the merits of these positions. That, however, is not the standard of review that we must apply in this context. "[O]ur task 'is not to weigh conflicting evidence and determine who has the better argument' " and we " 'may not set aside an agency's [decision] on the ground that an opposite conclusion would have been equally or more reasonable . . .' . . . . [Citation.]" (*Vineyard, supra,* 40 Cal.4th at p. 435.)

Our inquiry instead, in reviewing the Agency's exercise of its discretion, is to " ' " ' "ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute . . ." ' " ' " giving appropriate deference to the Agency's authority and presumed expertise. (*O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 586 [86 Cal.Rptr.3d 1].) " '[I]n technical matters requiring the assistance of experts and the study of marshaled scientific data as reflected herein, courts

---

[27] In a CEQA analysis, an agency must respond to opposing claims " ' " 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citations.]" ' " (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 899 [69 Cal.Rptr.3d 105].) " 'The fair argument standard is a "low threshold" test . . . .' " (*Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1331 [73 Cal.Rptr.3d 202].)

will permit administrative agencies to work out their problems with as little judicial interference as possible.' " (*Western States Petroleum Assn. v. South Coast Air Quality Management Dist.* (2006) 136 Cal.App.4th 1012, 1018 [39 Cal.Rptr.3d 354], fn. omitted.)

The administrative record and the Plan itself adequately demonstrate that Agency and its experts articulated the predicates for assumptions on which the Plan is based, and provided the factual basis and expert opinion to support those assumptions, while acknowledging the uncertainties inherent in the process. It considered reasonable probabilities—not simply possibilities—in its analyses, and the Agency did not abuse its discretion. UWMPA does not require more.

## III. Disposition

The judgment of the Sonoma Superior Court granting the writ of mandate is reversed. The matter is remanded to the trial court with instructions to enter a new and different judgment denying the writ.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied November 2, 2010, and respondents' petition for review by the Supreme Court was denied December 21, 2010, S188330. George, C. J., and Werdegar, J., did not participate therein.

## Appendix A: Abbreviations and Acronyms

Biological Assessment—Russian River Biological Assessment; submitted to NMFS by SCWA to develop an NMFS biological opinion

BMP's—best management practices; water demand management measures as indentified in the MOU

CEQA—California Environmental Quality Act

CUWCC—California Urban Water Conservation Council

DCP—City of Santa Rosa Discharge Compliance Project (also the Discharge Compliance Project)

DSS—decision support system; software approved by CUWCC for generating BMP modeling analysis and demand projections

EIR—Environmental Impact Report (as required under CEQA)

ESA—federal Endangered Species Act

FERC—Federal Energy Regulatory Commission

Flow Proposal—proposal contained in the Biological Assessment to reduce instream flow requirements for the Russian River and Dry Creek

MOU—CUWCC Memorandum of Understanding Regarding Urban Water Conservation

NMFS—National Marine Fisheries Service (now National Oceanic and Atmospheric Administration Fisheries Service)

PVP—PG&E's Potter Valley powerplant

SCWA—Sonoma County Water Agency (also the Agency)

SWRCB—State Water Resources Control Board

USACE—United States Army Corps of Engineers

UWMP—Urban Water Management Plan

UWMPA—Urban Water Management Planning Act (also the Act)

WSTRP—Water Supply, Transmission, and Reliability Project (also the Water Supply Project)

## Appendix B: Statutory Appendix

### § 10631.

A plan shall be adopted in accordance with this chapter that shall do all of the following:

(a) Describe the service area of the supplier, including current and projected population, climate, and other demographic factors affecting the supplier's water management planning. The projected population estimates shall be based upon data from the state, regional, or local service agency population projections within the service area of the urban water supplier and shall be in five-year increments to 20 years or as far as data is available.

(b) Identify and quantify, to the extent practicable, the existing and planned sources of water available to the supplier over the same five-year increments described in subdivision (a). If groundwater is identified as an existing or planned source of water available to the supplier, all of the following information shall be included in the plan:

(1) A copy of any groundwater management plan adopted by the urban water supplier, including plans adopted pursuant to Part 2.75 (commencing with Section 10750), or any other specific authorization for groundwater management.

(2) A description of any groundwater basin or basins from which the urban water supplier pumps groundwater. For those basins for which a court or the board has adjudicated the rights to pump groundwater, a copy of the order or decree adopted by the court or the board and a description of the amount of groundwater the urban water supplier has the legal right to pump under the order or decree. For basins that have not been adjudicated, information as to whether the department has identified the basin or basins as overdrafted or has projected that the basin will become overdrafted if present management conditions continue, in the most current official departmental bulletin that characterizes the condition of the groundwater basin, and a detailed description of the efforts being undertaken by the urban water supplier to eliminate the long-term overdraft condition.

(3) A detailed description and analysis of the location, amount, and sufficiency of groundwater pumped by the urban water supplier for the past five years. The description and analysis shall be based on information that is reasonably available, including, but not limited to, historic use records.

(4) A detailed description and analysis of the amount and location of groundwater that is projected to be pumped by the urban water supplier. The

description and analysis shall be based on information that is reasonably available, including, but not limited to, historic use records.

(c)(1) Describe the reliability of the water supply and vulnerability to seasonal or climatic shortage, to the extent practicable, and provide data for each of the following:

(A) An average water year.

(B) A single dry water year.

(C) Multiple dry water years.

(2) For any water source that may not be available at a consistent level of use, given specific legal, environmental, water quality, or climatic factors, describe plans to supplement or replace that source with alternative sources or water demand management measures, to the extent practicable.

(d) Describe the opportunities for exchanges or transfers of water on a short-term or long-term basis.

(e)(1) Quantify, to the extent records are available, past and current water use, over the same five-year increments described in subdivision (a), and projected water use, identifying the uses among water use sectors, including, but not necessarily limited to, all of the following uses:

(A) Single-family residential.

(B) Multifamily.

(C) Commercial.

(D) Industrial.

(E) Institutional and governmental.

(F) Landscape.

(G) Sales to other agencies.

(H) Saline water intrusion barriers, groundwater recharge, or conjunctive use, or any combination thereof.

(I) Agricultural.

(2) The water use projections shall be in the same five-year increments described in subdivision (a).

(f) Provide a description of the supplier's water demand management measures. This description shall include all of the following:

(1) A description of each water demand management measure that is currently being implemented, or scheduled for implementation, including the steps necessary to implement any proposed measures, including, but not limited to, all of the following:

(A) Water survey programs for single-family residential and multifamily residential customers.

(B) Residential plumbing retrofit.

(C) System water audits, leak detection, and repair.

(D) Metering with commodity rates for all new connections and retrofit of existing connections.

(E) Large landscape conservation programs and incentives.

(F) High-efficiency washing machine rebate programs.

(G) Public information programs.

(H) School education programs.

(I) Conservation programs for commercial, industrial, and institutional accounts.

(J) Wholesale agency programs.

(K) Conservation pricing.

(L) Water conservation coordinator.

(M) Water waste prohibition.

(N) Residential ultra-low-flush toilet replacement programs.

(2) A schedule of implementation for all water demand management measures proposed or described in the plan.

(3) A description of the methods, if any, that the supplier will use to evaluate the effectiveness of water demand management measures implemented or described under the plan.

(4) An estimate, if available, of existing conservation savings on water use within the supplier's service area, and the effect of the savings on the supplier's ability to further reduce demand.

(g) An evaluation of each water demand management measure listed in paragraph (1) of subdivision (f) that is not currently being implemented or scheduled for implementation. In the course of the evaluation, first consideration shall be given to water demand management measures, or combination of measures, that offer lower incremental costs than expanded or additional water supplies. This evaluation shall do all of the following:

(1) Take into account economic and noneconomic factors, including environmental, social, health, customer impact, and technological factors.

(2) Include a cost-benefit analysis, identifying total benefits and total costs.

(3) Include a description of funding available to implement any planned water supply project that would provide water at a higher unit cost.

(4) Include a description of the water supplier's legal authority to implement the measure and efforts to work with other relevant agencies to ensure the implementation of the measure and to share the cost of implementation.

(h) Include a description of all water supply projects and water supply programs that may be undertaken by the urban water supplier to meet the total projected water use as established pursuant to subdivision (a) of Section 10635. The urban water supplier shall include a detailed description of expected future projects and programs, other than the demand management programs identified pursuant to paragraph (1) of subdivision (f), that the urban water supplier may implement to increase the amount of the water supply available to the urban water supplier in average, single-dry, and multiple-dry water years. The description shall identify specific projects and include a description of the increase in water supply that is expected to be available from each project. The description shall include an estimate with regard to the implementation timeline for each project or program.

(i) Describe the opportunities for development of desalinated water, including, but not limited to, ocean water, brackish water, and groundwater, as a long-term supply.

(j) For purposes of this part, urban water suppliers that are members of the California Urban Water Conservation Council shall be deemed in compliance with the requirements of subdivisions (f) and (g) by complying with all the provisions of the "Memorandum of Understanding Regarding Urban Water Conservation in California," dated December 10, 2008, as it may be amended, and by submitting the annual reports required by Section 6.2 of that memorandum.

(k) Urban water suppliers that rely upon a wholesale agency for a source of water shall provide the wholesale agency with water use projections from that agency for that source of water in five-year increments to 20 years or as far as data is available. The wholesale agency shall provide information to the urban water supplier for inclusion in the urban water supplier's plan that identifies and quantifies, to the extent practicable, the existing and planned sources of water as required by subdivision (b), available from the wholesale agency to the urban water supplier over the same five-year increments, and during various water-year types in accordance with subdivision (c). An urban water supplier may rely upon water supply information provided by the wholesale agency in fulfilling the plan informational requirements of subdivisions (b) and (c).

## § 10632.

The plan shall provide an urban water shortage contingency analysis which includes each of the following elements which are within the authority of the urban water supplier:

(a) Stages of action to be undertaken by the urban water supplier in response to water supply shortages, including up to a 50 percent reduction in water supply, and an outline of specific water supply conditions which are applicable to each stage.

(b) An estimate of the minimum water supply available during each of the next three water years based on the driest three-year historic sequence for the agency's water supply.

(c) Actions to be undertaken by the urban water supplier to prepare for, and implement during, a catastrophic interruption of water supplies including, but not limited to, a regional power outage, an earthquake, or other disaster.

(d) Additional, mandatory prohibitions against specific water use practices during water shortages, including, but not limited to, prohibiting the use of potable water for street cleaning.

(e) Consumption reduction methods in the most restrictive stages. Each urban water supplier may use any type of consumption reduction methods in its water shortage contingency analysis that would reduce water use, are appropriate for its area, and have the ability to achieve a water use reduction consistent with up to a 50 percent reduction in water supply.

(f) Penalties or charges for excessive use, where applicable.

(g) An analysis of the impacts of each of the actions and conditions described in subdivisions (a) to (f), inclusive, on the revenues and expenditures of the urban water supplier, and proposed measures to overcome those impacts, such as the development of reserves and rate adjustments.

(h) A draft water shortage contingency resolution or ordinance.

(i) A mechanism for determining actual reductions in water use pursuant to the urban water shortage contingency analysis.

## § 10633.

The plan shall provide, to the extent available, information on recycled water and its potential for use as a water source in the service area of the urban water supplier. The preparation of the plan shall be coordinated with local water, wastewater, groundwater, and planning agencies that operate within the supplier's service area, and shall include all of the following:

(a) A description of the wastewater collection and treatment systems in the supplier's service area, including a quantification of the amount of wastewater collected and treated and the methods of wastewater disposal.

(b) A description of the quantity of treated wastewater that meets recycled water standards, is being discharged, and is otherwise available for use in a recycled water project.

(c) A description of the recycled water currently being used in the supplier's service area, including, but not limited to, the type, place, and quantity of use.

(d) A description and quantification of the potential uses of recycled water, including, but not limited to, agricultural irrigation, landscape irrigation, wildlife habitat enhancement, wetlands, industrial reuse, groundwater recharge, indirect potable reuse, and other appropriate uses, and a determination with regard to the technical and economic feasibility of serving those uses.

(e) The projected use of recycled water within the supplier's service area at the end of 5, 10, 15, and 20 years, and a description of the actual use of recycled water in comparison to uses previously projected pursuant to this subdivision.

(f) A description of actions, including financial incentives, which may be taken to encourage the use of recycled water, and the projected results of these actions in terms of acre-feet of recycled water used per year.

(g) A plan for optimizing the use of recycled water in the supplier's service area, including actions to facilitate the installation of dual distribution systems, to promote recirculating uses, to facilitate the increased use of treated wastewater that meets recycled water standards, and to overcome any obstacles to achieving that increased use.